STATE OF NORTH CAROLINA v. JOSE EUGENIO UVALLE, SR., DEFENDANT

No. COA01-531

(Filed 16 July 2002)

## 1. Criminal Law— testimony through translator—no plain error

There was no plain error in an assault prosecution where defendant testified through an interpreter. There may be circumstances in which translation difficulties could violate a non-English speaking defendant's constitutional rights, but those issues were not raised here, and the difficulties with court interpreters in this case did not impede the defense from confronting and cross-examining the State's witnesses or from presenting its evidence.

## 2. Assault— deadly weapon inflicting serious injury—assault inflicting serious injury—instruction not given

The trial court did not err in a prosecution for assault with a deadly weapon inflicting serious injury by not giving an instruc-

tion on assault inflicting serious bodily injury. Assault inflicting serious bodily injury is not a lesser included offense of assault with a deadly weapon inflicting serious injury because "serious injury" does not necessarily rise to the level of "serious bodily injury."

**3. Assault— deadly weapon inflicting serious injury—lesser included offenses—instruction not given**

The trial court did not err in a prosecution for assault with a deadly weapon inflicting serious injury by not giving instructions on the lesser included offenses of assault with a deadly weapon, assault inflicting serious injury, or simple assault where the uncontroverted evidence indicated that the victim sustained several deep knife wounds resulting in permanent debilitating injuries and that the injuries (however they occurred) were inflicted with a butcher knife with a blade about a foot long.

**4. Assault— instructions—misdemeanor assault—use of weapon**

The trial court did not err by not instructing on misdemeanor simple assault in an action for assault with a deadly weapon inflicting serious injury where defendant testified that he picked up a knife and a struggle ensued. Even if the knife was introduced by an accident such as falling out from under a pillow, there was no evidence to dispute that defendant used it.

Appeal by defendant from judgment entered 13 December 2000 by Judge Wiley F. Bowen in Brunswick County Superior Court. Heard in the Court of Appeals 21 February 2002.

*Attorney General Roy Cooper, by Assistant Attorney General Dorothy Powers, for the State.*

*John Calvin Chandler, for defendant-appellant.*

HUDSON, Judge.

Defendant was convicted by a jury of felonious assault with a deadly weapon inflicting serious injury and sentenced to a minimum term of twenty-five months and a maximum term of thirty-nine months. Defendant appeals.

We begin with a brief summary of pertinent facts. The State presented evidence to show that on the evening of 30 March 2000, defendant was involved in an altercation with his wife, Norma Uvalle.

Ms. Uvalle testified through an interpreter that her husband came to see her at work on 30 March 2000 and accused her of seeing another man. After an argument, defendant left, and Ms. Uvalle returned to her work. That night, Ms. Uvalle left work earlier than usual, arriving home at 11:15 p.m. Five minutes later, defendant arrived accompanied by the Uvalles' twelve year old son, Junior. Ms. Uvalle testified that defendant followed her to the bedroom and "kept asking if [she] would tell the truth" about seeing another man. Defendant left the room, and Ms. Uvalle heard noises like he was looking for something in the sink in the kitchen. Ms. Uvalle testified that he came back to the bedroom and threw her off the bed; she did not see a knife until, "[j]ust when he had it in his hand and he started to stab me—hurt me." Ms. Uvalle began to scream and her children ran into the bedroom. Junior took the knife away from his father and he helped put a pillow under his mother, trying to stop the bleeding. Defendant told Ms. Uvalle that "first [] he was going to finish with her (Ms. Uvalle), and then afterwards, he was going to finish with himself." She sustained knife wounds in both arms, her shoulder, and her ribs. Ms. Uvalle testified that defendant had threatened and attacked her previously, and had attempted to cut her with a razor blade in January of the same year.

Dr. Kevin Reese, who treated Ms. Uvalle when she was brought into the emergency room on 30 March 2000, testified that Ms. Uvalle had at least five lacerations or stab wounds, four of which required treatment. Three of the lacerations were connected to each other in that the blade went through the tissue of Ms. Uvalle's forearm and penetrated her abdomen and chest. She also sustained injuries to the shoulder, which Dr. Reese described as "directed straight down into the shoulder, entering through the Deltoid muscle, which is the muscle that allows you to raise the shoulder like this (indicating), and then entered—hit bone down into the joint space." Dr. Reese opined that Ms. Uvalle was stabbed in the shoulder from above, and from the front in the case of the forearm and torso injuries. He did not believe the injuries were self-inflicted and described them as defensive wounds. On cross-examination, Dr. Reese said that the wounds did not necessarily indicate a struggle, although he agreed that they did indicate that Ms. Uvalle's body changed positions during the incident. Dr. Reese also testified that Ms. Uvalle's injuries were both serious and permanent.

The State also introduced the testimony of Ms. Uvalle's sister, Olga Gavan Castellio, who was living in the Uvalles' home at the time

of these events. She testified that on 30 March 2000, she heard her sister screaming and found the defendant "on top of" his wife with a butcher knife in his hand. Ms. Castellio also testified that just before the screams, she heard defendant in the kitchen and heard the sounds of dishes moving in the sink, where she had earlier put the butcher knife. The Uvalles' son, Junior, testified that when he heard his mother screaming, he rushed into the bedroom, and found his father holding the knife over his mother, who had blood on her. In part, Junior testified as follows:

A. I grabbed my dad from the neck and was trying to pull him back so he wouldn't stab my mom again.

Q. And were you able to do that, were you able to stop him?

A. No.

Q. What happened?

A. I went in the bed (sic)—I was trying to pull the knife and my mom said let go so he won't stab you. I said, I'm not going to until he lets go. And—and then my aunt came and she said, "Let her go, Eugenio (the defendant)." And he said, "No, I ain't." And then he said, "Okay, I'm going to let her go, but I'm going to kill myself." And I said, "Dad, don't do that because if you do that, I'm going to kill myself, too."

. . .

Q. Were you—both of you just holding it (the knife) for a little while?

A. It was me, and my mom, and my dad was holding it.

Q. Now, what part of the knife did your mom have?

A. It was sharp—

Q. Did she have the blade in her hand?

A. Yes, the blade.

. . .

Q. Did your father receive any cuts that night?

A. No.

Q. What was your father saying while all this was going on?

A. He—I can't remember, but I—can't remember.

Q. Did he threaten your mother in any way that you remember?

A. He said he was going to kill her.

Junior testified that he acted as interpreter for his mother when emergency medical personnel arrived, during the trip to the hospital, and once they arrived at the hospital. He also reported that in January of the same year, he saw his father threaten his mother with a pocket knife.

Defendant testified through an interpreter in his own defense. He agreed that he was upset with his wife on the night of 30 March 2000, because he suspected that she was seeing another man. However, he testified that he did not bring the knife in from the kitchen. Instead he contended that the knife was underneath Ms. Uvalle's pillow on the bed, and that he first saw the knife when it fell out from underneath the pillow. He testified during direct-examination:

Q. And how did the knife get from under the pillow?

(QUESTION TRANSLATED TO WITNESS BY INTERPRETER)

A. (ANSWER IN SPANISH)

INTERPRETER: He don't know.

Q. Well, did he take it out from under the pillow or did his wife take it out from under the pillow?

(QUESTION TRANSLATED TO WITNESS BY INTERPRETER)

A. (ANSWER IN SPANISH)

INTERPRETER: The knife fell when she moved.

Q. And did she later grab the knife?

(QUESTION TRANSLATED TO WITNESS BY INTERPRETER)

A. (ANSWER IN SPANISH)

INTERPRETER: When—when he saw the knife on the floor, he asked his wife, "Are you going to—you going to kill me after you done to me?"

(WITNESS SAYS SOMETHING IN SPANISH)

INTERPRETER: I was very mad. I picked up the knife and I cut myself.

Q. All right. Did you then struggle for the knife? Did your wife try to grab the knife?

(QUESTION TRANSLATED TO WITNESS BY INTERPRETER)

A. (ANSWER IN SPANISH)

INTERPRETER: No, he tried to take away the knife from her.

Q. Did you—did you all have a struggle together?

(QUESTION TRANSLATED TO WITNESS BY INTERPRETER)

A. (ANSWER IN SPANISH)

INTERPRETER: Yes.

Defendant later testified during cross-examination that at first his wife was sitting on the bed, then they both fell down in the bed, then he was under her, and once he had the knife, he was on top of her. Defendant insisted that his wife cut herself accidentally when they were struggling for the knife.

The defendant also presented the testimony of his uncle, who saw the Uvalles' argument the previous January. On that occasion, the uncle said that Ms. Uvalle had a piece of a broom handle in her hand. Defendant's employer testified as to his opinion that defendant is a truthful, law-abiding, and non-aggressive citizen who is a dependable worker.

The trial court instructed the jury on assault with a deadly weapon inflicting serious injury and not guilty. The court further instructed the jurors that if they found that defendant acted in self-defense, that would excuse defendant's actions, and they should find him not guilty. The jury found defendant guilty as charged. In his brief, defendant makes two arguments: (1) problems with the court interpreter amounted to plain and reversible error, and (2) the trial court erred by failing to instruct the jury on four lesser included offenses of assault with a deadly weapon inflicting serious injury. Although he raised eight assignments of error in the record on appeal, he only brings forward numbers 1, 3, 4, 5, and 7. Accordingly, assignments of error 2, 6, and 8 are deemed abandoned. See N.C. R. App. Proc. 28(a) (2001). We address defendants' two issues in order.

[1] First, defendant contends that the "trial court committed reversible error and plain error by not directing the interpreter for the State to interpret exactly the question asked by the State and the answer as given by the witness." The State repeatedly asked the interpreter to repeat exactly what the witness and attorney said. The trial judge instructed the interpreter several times, as requested by the attorneys on both sides, and replaced one interpreter during a recess "to give [her] a break."

We recognize that there may be circumstances in which translation difficulties could violate a non-English speaking defendant's constitutional rights to a fair trial, to confront and cross-examine witnesses, or to due process under the North Carolina and United States Constitutions. However, these issues were not raised here. During trial, when an interpreter failed to interpret in the first person, or engaged in conversation in Spanish with the testifying witness without translating for the court the contents of the exchange, defendant's counsel expressed concern and requested further instructions, but never expressly noted an objection. Defendant has properly couched his argument as plain error. *See State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983). When we review for plain error, we only grant relief when the "error is a *fundamental* error, something so basic, so prejudicial . . . that justice cannot have been done," or where it denies a fundamental right to a fair trial, or where it had "a probable impact on the jury's finding that the defendant was guilty." *Id.* (internal citation and quotations omitted) (emphasis in original). We do not find error, let alone error of this magnitude, in the instructions given or not given to the interpreters here. After careful review of the transcript and record on appeal, we conclude that the difficulties with the court interpreters did not impede the defense from confronting and cross-examining the state's witnesses or from presenting its evidence for the jury's consideration. Thus, we overrule this assignment of error.

In his second argument, defendant contends that the trial court erred by not instructing the jury on four lesser included offenses of assault with a deadly weapon inflicting serious injury, to wit: (1) felonious assault inflicting serious bodily injury, (2) assault with a deadly weapon, (3) assault inflicting serious injury, and (4) simple assault. We disagree.

A defendant "is entitled to an instruction on lesser included offense[s] if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." *State v.*

*Leazer*, 353 N.C. 234, 237, 539 S.E.2d 922, 924 (2000); *see also State v. Collins*, 334 N.C. 54, 58, 431 S.E.2d 188, 190-91 (1993); *State v. Siler*, 66 N.C. App. 165, 166, 311 S.E.2d 23, 24, *aff'd as modified*, 310 N.C. 731, 314 S.E.2d 547 (1984). However, "a lesser offense should not be submitted to the jury if the evidence is sufficient to support a finding of all the elements of the greater offense, and there is no evidence to support a finding of the lesser offense." *State v. Nelson*, 341 N.C. 695, 697, 462 S.E.2d 225, 226 (1995).

**[2]** The elements of assault with a deadly weapon inflicting serious injury are "(1) an assault (2) with a deadly weapon (3) inflicting serious injury (4) not resulting in death." *State v. Aytche*, 98 N.C. App. 358, 366, 391 S.E.2d 43, 47 (1990); *see also* N.C. Gen. Stat. § 14-32(b) (2001). We first note that assault inflicting serious bodily injury is not a lesser included offense of assault with a deadly weapon inflicting serious injury, and that such an instruction would not have been proper here. *See e.g.*, *State v. Hannah*, 149 N.C. App. 713, 563 S.E.2d 1 (2002) (holding that assault inflicting serious bodily injury is not a lesser included offense of assault with a deadly weapon with intent to kill and inflict serious injury as defined in N.C.G.S. § 14-32(a)). The language of N.C. Gen. Stat. § 14-32.4 (2001), defines "serious bodily injury" as: "[a] bodily injury that creates a substantial risk of death, or that causes serious permanent disfigurement, coma, a permanent or protracted condition that causes extreme pain, or permanent or protracted loss or impairment of the function of any bodily member or organ, or that results in prolonged hospitalization." However, our courts have held that "serious injury," as used in connection with a charge under N.C.G.S. § 14-32(b), does not necessarily rise to the level of "serious bodily injury." *See Hannah*, 149 N.C. App. at 718, 563 S.E.2d at 5. The *Hannah* Court stated: "Thus, while there may be factual situations in which the elements of 'serious bodily injury' and 'serious injury' are in apparent identity, this does not satisfy the definitional approach required to determine whether one offense is a lesser included offense of another." *Id.* "We conclude that, because the element of 'serious bodily injury' requires proof of more severe injury than the element of 'serious injury,' " assault inflicting serious bodily injury is not a lesser included offense of assault with a deadly weapon inflicting serious injury. *Id.* Thus, since defendant was not charged with an offense under N.C.G.S. § 14-32.4, but only under N.C.G.S. § 14-32(b), he was not entitled to an instruction on an offense which is not a lesser included offense and with which he was not charged.

**[3]** Defendant also argues that he was entitled to instructions on the lesser included offenses of assault with a deadly weapon (no serious injury), assault inflicting serious injury (no deadly weapon), and simple assault (no serious injury or deadly weapon). *See* N.C.G.S. § 14-32(b). Assault is defined as either "a show of violence causing a reasonable apprehension of immediate bodily harm" or "an intentional offer or attempt by force or violence to do injury to the person of another." *State v. Thompson*, 27 N.C. App. 576, 577, 219 S.E.2d 566, 567-68 (1975), *disc. rev. denied*, 289 N.C. 141, 220 S.E.2d 800 (1976). Whether defendant is entitled to an instruction on an offense which is a lesser included offense depends upon the evidence presented at trial.

Defendant testified that the knife was under the pillow, that it fell out, and the struggle ensued. During the struggle, he testified that Ms. Uvalle was accidentally cut by the knife. Ms. Uvalle, on the other hand, testified that the defendant repeatedly stabbed her with the knife, that she grabbed the blade to stop him from stabbing her. Their son corroborated this description of events. The emergency room doctor also gave his opinion that Ms. Uvalle's injuries were not self-inflicted.

Generally, "[w]hether a serious injury has been inflicted depends upon the facts of each case and is generally for the jury to decide under appropriate instructions." *State v. Hedgepeth*, 330 N.C. 38, 53, 409 S.E.2d 309, 318 (1991), *cert. denied*, 529 U.S. 1006, 146 L. Ed. 2d 223 (2000). "Pertinent factors for jury consideration include hospitalization, pain, blood loss, and time lost at work." *State v. Woods*, 126 N.C. App. 581, 592, 486 S.E.2d 255, 261 (1997). Here, the trial court did not instruct the jury on the offense of assault with a deadly weapon, which does not include the element of "serious injury." In *Hedgepeth*, the Supreme Court approved a peremptory instruction on serious injury, where the evidence of the prosecuting witness's injury " 'is not conflicting and is such that reasonable minds could not differ as to the serious nature of the injuries inflicted.' " 330 N.C. at 54, 409 S.E.2d at 318 (quoting *State v. Pettiford*, 60 N.C. App. 92, 97, 298 S.E.2d 389, 392 (1982)).

In *State v. Crisp*, 126 N.C. App. 30, 37, 483 S.E.2d 462, 466-67, *disc. rev. denied*, 346 N.C. 284, 487 S.E.2d 559 (1997), the trial court gave a peremptory instruction on "serious injury" when the victim was shot and the bullet went through his calf muscle. The defendant was charged with assault with a deadly weapon with intent to kill inflicting serious injury under the same statute as the one at issue in

the present case, N.C.G.S. § 14-32. This Court "decline[d] to disturb the trial court's determination that [the victim's] injury was 'serious' within the meaning of [N.C.G.S.] § 14-32(a) and that reasonable minds could not differ as to the seriousness of his injuries." *Id.* at 37, 483 S.E.2d at 467. "Thus, the trial court was not required to submit the lesser included offense of assault with a deadly weapon to the jury." *Id.*

Here, the trial court did not give a peremptory instruction, but there is no genuine dispute in the evidence as to the serious nature of the prosecuting witness' injury. The uncontroverted evidence, including the unequivocal opinion of the treating physician, indicates that she sustained several deep knife wounds resulting in permanent debilitating injuries. Thus, defendant was not entitled to instructions on either simple assault or assault with a deadly weapon which omitted the element of "serious injury," since the evidence did not "permit the jury rationally to find him guilty of the lesser offense and acquit him of the greater." *Leazer*, 353 N.C. at 237, 539 S.E.2d at 924.

Further, the evidence was undisputed that, however it occurred, Ms. Uvalle's injuries were sustained by a butcher knife with a blade "about a foot long," which qualifies as a deadly weapon *per se. See State v. Cox*, 11 N.C. App. 377, 380, 181 S.E.2d 205, 207 (1971); *State v. Parker*, 7 N.C. App. 191, 171 S.E.2d 665 (1970). Thus, defendant was not entitled to an instruction on an assault not involving a deadly weapon.

[4] Finally, defendant argues that the jury should have been instructed on misdemeanor simple assault, pursuant to N.C. Gen. Stat. § 14-33 (2001). However, this Court has explained in *State v. Owens*, 65 N.C. App. 107, 110-11, 308 S.E.2d 494, 498 (1983),

[t]he primary distinction between felonious assault under G.S. § 14-32 and misdemeanor assault under G.S. § 14-33 is that a conviction of felonious assault requires a showing that a deadly weapon was used *and* serious injury resulted, while if the evidence shows that only one of the two elements was present, i.e., that *either* a deadly weapon was used *or* serious injury resulted, the offense is punishable only as a misdemeanor.

(emphasis in original). Defendant contended at oral argument and the State agreed, that if the knife was introduced into the altercation by accident, he was entitled to this instruction because the jury could find the absence of the "use of a deadly weapon" element. However,

the defendant testified that he "picked up the knife" and the struggle ensued. Thus, we believe that the trial court correctly concluded that, even if the jury believed that the knife fell out from under the pillow, there was no evidence to dispute that defendant "used" it. We concluded above that a deadly weapon caused the victim's injuries, and that there is no rational dispute about whether serious injury resulted. Therefore, we hold that the trial court properly declined to instruct the jury on misdemeanor assault.

In sum, the trial court did not commit plain error in managing the interpreters, and did not err by refusing to instruct the jury on the lesser-included offenses of assault with a deadly weapon inflicting serious injury.

No error.

Judges MARTIN and CAMPBELL concur.