STATE OF NORTH CAROLINA v. AHMED BABIKER IBRAHI MOHAMED, Defendant

No. COA09-943

(Filed 20 July 2010)

**1. Constitutional Law— Miranda warnings—limited English proficiency**

There was no plain error in admitting a robbery defendant's inculpatory statements to officers where defendant contended that the *Miranda* warnings were not adequate and that his waiver was not freely and voluntarily given because his English was limited. The record and the totality of the circumstances reveal that the trial court had ample basis for believing that defendant had a significant command of the English language, that he was able to comprehend the *Miranda* warnings, and that he knowingly and intelligently waived his rights. Had defendant made a timely motion to suppress, the trial court would have had an opportunity to evaluate the credibility of the arresting officers and defendant and address the dispute about defendant's ability to comprehend English.

**2. Constitutional Law— effective assistance of counsel—evidentiary issues—further development**

A robbery defendant's contention that he received ineffective assistance from his trial counsel was not addressed where the record revealed that certain evidentiary issues needed further development. Defendant's right to assert the claim in a subsequent motion for appropriate relief or a postconviction petition was not precluded.

**3. Appeal and Error— plain error—adequacy of interpreters**

A robbery defendant's challenge to the adequacy of the interpreters that assisted him in the trial court was not cognizable under the plain error doctrine. Moreover, the interpreters used at trial were selected by defendant, and the record does not reflect that the interpreters were actually ineffective.

**4. Criminal Law— plea transcript—erroneous file number—clerical error**

The use of an erroneous file number on a transcript of plea was a mere clerical error to be corrected on remand.

**5. Evidence— prior crimes or bad acts—common plan or scheme—identity of perpetrator**

The trial court did not err in a robbery prosecution by admitting evidence of a prior robbery where the similarities between the two robberies were striking and the evidence tended to prove both a common plan or scheme and defendant's identity as the perpetrator.

**6. Robbery— sufficiency of evidence—doctrine of recent possession—prior similar crime**

There was substantial evidence that defendant committed an armed robbery under the doctrine of recent possession, even if his challenged inculpatory statements were excluded. Defendant used a stolen credit card within six minutes of the robbery and was involved in a prior robbery that was similar.

Appeal by defendant from judgment entered 11 February 2009 by Judge Kenneth C. Titus in Guilford County Superior Court. Heard in the Court of Appeals 11 January 2010.

*Attorney General Roy Cooper, by Assistant Attorney General Michael D. Youth and Derrick C. Mertz, for State.*

*Donald R. Vaughan and Angela Bullard Fox, for defendant.*

ERVIN, Judge.

Defendant Ahmed Babiker Ibrahi Mohamed appeals his convictions for robbery with a dangerous weapon and obtaining property by false pretenses on the grounds that (1) his confession was obtained in violation of his constitutional rights against compulsory self-incrimination, (2) he received ineffective assistance from his trial counsel, (3) the interpreters utilized at his trial were inadequate, (4) his guilty plea to obtaining property by false pretenses was unlawfully accepted, (5) the trial court erred in admitting evidence of his involvement in another robbery, and (6) the evidence was not sufficient to support his robbery conviction. After carefully considering Defendant's challenges to his convictions in light of the record and the applicable law, we find no error of law, but remand this case to the trial court for correction of a clerical error.

## I.  Factual Background

### A.  Substantive Facts

#### 1.  State's Evidence

At trial, the State presented evidence tending to show that, at approximately 8:50 p.m. on 13 May 2007, Defendant approached Douglas Whitlock at a Greensboro carwash, took $20 and a credit card from him at gunpoint, and fled the scene on foot. At the time that he robbed Mr. Whitlock, Defendant was wearing a black baseball cap.

Approximately six minutes later, Defendant, who was still wearing the black baseball cap, entered a nearby Shell station and purchased cigarettes using Mr. Whitlock's credit card. Tewodros Tessma, the clerk in the Shell station who handled Defendant's transaction, knew Defendant's last name. Mr. Tessma also noted that the name on the credit card differed from Defendant's name and contacted the police immediately after Defendant left the premises. As a result of that call to the police, Mr. Tessma provided Officer B.J. Wingfield of the Greensboro Police Department with a description of the vehicle Defendant was driving and its license plate number. In addition, Mr. Tessma provided Officer Wingfield with a surveillance videotape depicting Defendant's purchase and a copy of the credit card receipt that Defendant had signed.

Officer J.P. McSweeney of the Greensboro Police Department ran the license plate number on the vehicle that Defendant was driving and discovered that the last name of the person to whom the vehicle was registered matched that of Defendant. Officer McSweeney spotted the car at approximately 12:15 a.m. on 14 May 2007, stopped the vehicle, and took Defendant into custody. At the time that Officer McSweeney stopped the vehicle, Defendant complied with Officer McSweeney's orders to turn the car off, step out of the car with his hands up, and walk backwards towards him. A search of the vehicle resulted in the discovery of a black baseball cap in the back seat and a spent .22 caliber shell in the ash tray; however, no firearm was found in the vehicle.

At approximately 3:45 a.m., Detective Eric Miller of the Greensboro Police Department read Defendant's *Miranda* rights to him at the police station. Detective Miller wrote the word "yes" next to each sentence that he read after receiving affirmation from Defendant that he understood its meaning. According to Detective Miller, Defendant was capable of communicating effectively

in English. Defendant signed the Statement of Rights and Waiver of Rights form. Although Defendant spoke with an accent, Detective Miller testified that Defendant had no comprehension problems and that he did not request an interpreter prior to or during the interrogation.

During his conversation with Detective Miller, Defendant reported making a purchase at the Shell gas station "with a credit card I found. I did not rob anybody." Detective Miller pointed out that no one had mentioned a robbery and asked Defendant why he robbed Mr. Whitlock. Defendant became emotional and cried out, "I was broke." Defendant later admitted:

> I saw the guy outside his car. I told Maaz[1] I was going to rob him and he said, "I don't care." I got out of the car. [The] gun was in my pocket. I went up to the guy and pointed the gun at him and said "Give me the money." . . . . He gave me $20.00 and a credit card. Then we went to the store.

Defendant stated that, after the robbery, he threw the gun and the credit card out of the car window. Defendant also provided a written statement to the police, in which he explained, "I want to same white gay and I poot the gun in has face and I take 20$ and cradet card and after that I went to the par[t]y."

## 2. Defendant's Evidence

Defendant is the son of a Sudanese native who had been granted political asylum in the United States and whose family had also been allowed to enter the country in order to escape political persecution. Defendant speaks Classical Arabic, with a native dialect of Sudanese and a native tongue of Egyptian Colloquial Arabic or Donglawi. At the time of the alleged robbery, Defendant had been in the United States less than six months. Defendant's ability to speak and understand English at the time of his interrogation was limited. Although Defendant requested an interpreter at the beginning of the interrogation and during the questioning by Officer Miller, none was provided. Neither the events that led up to the waiver of Defendant's *Miranda* warnings nor the substantive interview that Detective Miller conducted with Defendant were recorded.

On the evening of 13 May 2007, Defendant was at home preparing to attend a wedding reception when his friend, Maaz Shogar, arrived.

---

1. "Maaz" is Maaz Shogar, a friend of Defendant's, with whom Defendant claimed to have spent the night of the robbery.

Defendant and Mr. Shogar left Defendant's residence in order to obtain gasoline for Defendant's car. Mr. Shogar provided Defendant with a credit card for use in making the necessary purchase. Subsequently, Defendant was detained and arrested. Without an interpreter to assist him in the interrogation process, Defendant signed and dated the written statement at the behest of Detective Miller. According to Defendant, the statement that he provided to Detective Miller consisted of information that Mr. Shogar had provided to him about the origin of the credit card.

### B. Procedural History

On 14 May 2007, warrants for arrest charging Defendant with obtaining property by false pretenses and robbery with a dangerous weapon were issued. On 2 July 2007, the Guilford County grand jury returned bills of indictment charging Defendant with robbery with a dangerous weapon and obtaining property by false pretenses. The cases against Defendant came on for trial before the trial court and a jury at the 9 February 2009 criminal session of the Guilford County Superior Court. Before the beginning of the trial, Defendant acknowledged on the record that he had consented to allow his trial counsel to admit his guilt of obtaining property by false pretenses. Prior to the beginning of the jury's deliberations, Defendant entered a guilty plea to obtaining property by false pretenses. On 11 February 2009, the jury returned a verdict finding Defendant guilty of robbery with a dangerous weapon. After determining that Defendant had no prior record points and should be sentenced as a Level I offender, the trial court consolidated Defendant's convictions for judgment and sentenced Defendant to a minimum term of 60 months and a maximum term of 81 months imprisonment in the custody of the North Carolina Department of Correction. Defendant noted an appeal to this Court from the trial court's judgment.

### II. Legal Analysis

### A. Admission of Defendant's Inculpatory Statements

[1] First, Defendant contends that the trial court committed plain error by failing to exclude the statement he provided to investigating officers following his arrest. In essence, Defendant contends both that the *Miranda* warnings that were given to him were inadequate and that he did not freely and voluntarily waive his *Miranda* rights. We disagree.

With commendable candor, Defendant acknowledges that his trial counsel failed to move to suppress his post-arrest statements and

contends that, given the absence of such a contemporaneous objection, his challenge to the admission of his statements to investigating officers is subject to plain error review.

> T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a *fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done, or where [the error] is grave error which amounts to a denial of a fundamental right of the accused, or the error has resulted in a miscarriage of justice or in the denial to appellant of a fair trial or where the error is such as to seriously affect the fairness, integrity or public reputation of judicial proceedings or where it can be fairly said the instructional mistake had a probable impact on the jury's finding that the defendant was guilty.

*State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quotation marks and citations omitted). "Under plain error review, 'the appellate court must be convinced that absent the error the jury probably would have reached a different verdict.' " *State v. Doe*, 190 N.C. App. 723, 732, 661 S.E.2d 272, 278 (2008) (citations omitted).

According to Defendant, the trial court should have suppressed the statements that he gave to investigating officers because of his age and status as a non-native speaker of the English language. More specifically, Defendant argues that, as an 18-year-old tenth-grader who had only been in the United States for six months at the time of the alleged robbery, Defendant's ability to comprehend the nuances of the English language were extremely limited, so that he lacked the ability to understand and to knowingly and intelligently waive the *Miranda* warnings that were administered to him. In other words, Defendant's challenges to the substance of the *Miranda* warnings that were given to him and to the voluntariness of his waiver of his *Miranda* rights both stem from his allegedly deficient command of the English language.

Ordinarily, when this Court reviews a challenge to the trial court's denial of a motion to suppress, the trial court's findings of fact are conclusive on appeal if supported by competent evidence, even if the record contains evidence that would support contrary findings. *State v. Downing*, 169 N.C. App. 790, 793-94, 613 S.E.2d 35, 38 (2005). Assuming that the trial court's findings of fact have adequate evidentiary support, the question then becomes whether the conclusions of

law are supported by the factual findings. *State v. Coplen*, 138 N.C. App. 48, 52, 530 S.E.2d 313, 317, *cert. denied*, 352 N.C. 677, 545 S.E.2d. 438 (2000). The trial court's conclusions of law are reviewable *de novo. State v. Mahaley*, 332 N.C. 583, 592-93, 423 S.E.2d 58, 64 (1992), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 649 (1995). However, since no motion to suppress was made in this instance, the usual standard of review cannot be employed in evaluating Defendant's challenge to the admission of his statements. Instead, we must simply examine the information before the trial court in order to determine if it committed plain error by allowing the admission of the challenged statements.

Before being subjected to custodial interrogation, a criminal suspect must be advised that he:

> has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda v. Ariz.*, 384 U.S. 436, 479, 16 L. Ed. 2d 694, 726 (1966). When reviewing the adequacy of *Miranda* warnings given to a criminal defendant, this Court must decide whether the warnings reasonably apprised the suspect of his rights. *State v. Ortez*, 178 N.C. App. 236, 245, 631 S.E.2d 188, 195 (2006), *disc. review denied and appeal dismissed*, 361 N.C. 434, 649 S.E.2d 642 (2007). In order "to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." *Miranda*, 384 U.S. at 467, 16 L. Ed. 2d at 719. If the individual decides to confess after being appropriately advised of his or her *Miranda* rights and deciding to freely and voluntarily waive them, then the voluntariness of the resulting statement is "controlled by that portion of the Fifth Amendment . . . commanding that no person shall be compelled in any criminal case to be a witness against himself." *Id.* at 461, 16 L. Ed. at 716 (1966) (internal quotation omitted). Whether a waiver of one's *Miranda* rights is knowingly and intelligently made depends on the specific facts and circumstances of each case, including the background, experience, and conduct of the accused. *Id.* at 468-69, 16 L. Ed. 23 at 720. As a result, we determine whether a proper waiver of a defendant's *Miranda* rights occurred by examining the totality of the circumstances, including: (1) the familiarity of the accused with the criminal justice system, (2) the length of the interrogation, (3) whether the

accused has been deprived of sleep, (4) whether the accused was held incommunicado, (5) whether there were threats of violence, (6) whether promises were made in exchange for a statement, (7) whether the accused has been deprived of food, and (8) the age and mental condition of the accused. *State v. Kemmerlin*, 356 N.C. 446, 458, 573 S.E.2d 870, 880-81 (2002). "The presence of any one of these factors is not determinative." *Id.*

At bottom, Defendant's challenge to the substance of the *Miranda* warnings that were given to him on the night that he was taken into custody hinges on his alleged minimal command of English. Defendant cites *Ortez* and *U.S. v. Perez-Lopez*, 348 F.3d 839 (9th Cir. 2003), in support of his contention that the *Miranda* warnings that were given to him were inadequate. Defendant's reliance on these decisions, however, is misplaced. Neither of the defendants in those cases had any command of the English language. The Court in *Perez-Lopez* ruled in the Spanish-speaking defendant's favor based on a translation glitch that significantly altered the explanation of his right to a court-appointed attorney. *Id.* at 847-48. The literal translation at issue in *Perez-Lopez* warned the defendant that he had "the right to solicit the court for an attorney," which the United States Court of Appeals for the Ninth Circuit held could be interpreted to suggest that a defendant's request for counsel might be rejected. *Id.* at 848. In *Ortez*, this Court found that an imprecise Spanish translation did not invalidate the *Miranda* warnings given to the defendant because there had been no material alteration of the warning's meaning. *Ortez*, 178 N.C. App. at 246, 631 S.E.2d at 196. As a result, both of these decisions hinge upon alleged mistranslations of specific *Miranda* warnings rather than upon generalized allegations that a Defendant did not understand English sufficiently well to properly waive his *Miranda* rights.

A review of the record reveals that the trial court had ample basis for believing that Defendant had significant command of the English language. Officer Marcus Pollock testified that he conferred with Defendant and his attorney during an investigation of a separate robbery and that Defendant "seemed as though he understood most of the questions." Defendant drafted his confession in English. Although Defendant's written statement is not a model of English composition, it is easily comprehensible. At the time that his car was stopped, Officer McSweeney ordered Defendant "to turn the car off. He turned the car off." In addition, Officer McSweeney also noted that, "I told the driver to step out of the car with his hands up, and once he did

that, I instructed him to walk backwards towards our cars, and he did[.]" Defendant's compliance with Officer McSweeney's instructions provided further evidence of Defendant's ability to comprehend the English language. According to Detective Miller, Defendant did not express any comprehension difficulties during the interrogation process. On cross-examination, Detective Miller testified that:

Q. Do you recall that he is from the Sudan?

A. Yes, sir.

Q. And he speaks with, well, broken English, or his English is not that well, is it?

A. I don't remember having any problems communicating with him.

Q. And so would you say his English is good?

A. He has an accent, definitely. I mean, he has a definite accent, but I don't remember having a problem communicating with him.

A. And, therefore, would you say his English is good?

Q. I would say.

A. Did he—at any time did you tell him—or did he advise you that he also speaks Arabic?

A. No, sir.

Q. Did you ever ask of any other languages that he spoke?

A. No, I didn't.

Q. So it's fair to say that no interpreter or nothing was brought in case—for a better understanding in his native language.

A. It was never an issue, because it's my understanding that nobody that whole evening had any problems communicating with him. Generally, when you get called out in the middle of the night, and most of your on-call leaders and your veteran officers on the scene, like [Officer] McSweeney, address those issues for you, and there was no mention of any kind of language barrier or difficulty talking to him. If there had been, they would have put in motion a plan to get an interpreter there. My understanding, nobody had any issues communicating with him.

Q. But you weren't on the scene, were you?

A. No, but I didn't have any problems communicating with him either.

Q. So it's fair to say, with the explanation, you did not get an interpreter for him.

A. No, sir; I didn't get an interpreter. Didn't see the need for it.

As a result, we conclude that there was ample evidence before the trial court to support a conclusion that Defendant's English skills were sufficient to enable him to understand the contents of the *Miranda* warnings that were read to him on the night that he was taken into custody.

Similarly, considering the "totality of the circumstances," the evidence before the trial court is more than sufficient to permit a finding that Defendant's command of English was sufficient to permit him to knowingly and intelligently waive his *Miranda* rights. In seeking a contrary result, Defendant relies primarily on *People v. Redgebol*, 184 P.3d 86, 95-100 (Colo. 2008), in which the Colorado Supreme Court held that a defendant's waiver of his *Miranda* rights was ineffective where the defendant, who was a Sudanese refugee, only spoke the Dinka language, had limited intellectual functioning, had never attended school, had gained his understanding of English from watching daytime television, and, during his custodial interrogation by investigating officers, experienced substantial communication difficulties involving himself, his interpreter, and the police. In this case, however, the record before the trial court contained evidence tending to show that Defendant had a command of conversational English, that Defendant had not sought the aid of an interpreter, that less than four hours had lapsed between the time of Defendant's arrest and the time that Defendant made his statements to Detective Miller, that Defendant had not been deprived of food or sleep in the interim between his arrest and the time that he made his statement to Officer Miller, that there had not been any threats or any promises made to Defendant in order to induce him to waive his *Miranda* rights or make a statement, and that Defendant had not been prevented from contacting his parents or an attorney. In light of the testimony provided by the investigating officers concerning their interactions with Defendant, the trial court had ample basis for concluding that Defendant's limited familiarity with the American criminal justice system did not translate into an inability to comprehend

his rights or to make a valid decision to waive his rights against compulsory self-incrimination as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 23 of the North Carolina Constitution.

On appeal, Defendant places considerable emphasis upon factual material concerning his English comprehension skills that had not been admitted into the record at the time that the trial court allowed the admission of Defendant's statements to investigating officers. Aside from the fact that the trial court had to base its decision to allow the admission of Defendant's statements on the information available at the time they were offered, much of the information upon which Defendant now relies either never made it into the trial record at all or directly contradicted the testimony of the investigating officers. Had Defendant made a timely motion to suppress his statements to investigating officers, the trial court would have had an opportunity to evaluate the relative credibility of the investigating officers, who contended that Defendant had no trouble communicating in English at the time that he was interrogated, as well as Defendant, who claimed to have been unable to effectively communicate in English and to have requested an interpreter during his conversations with the investigating officers. However, the absence of such a motion precluded the trial court from having any opportunity to address this fundamental dispute between the investigating officers and Defendant relating to Defendant's ability to comprehend English. Under that set of circumstances, we believe that the trial court would not have committed plain error in the event that there was any evidence in the record that supported its decision. Since the record contains ample evidence tending to show that Defendant was able to comprehend the *Miranda* warnings that were administered to him and that Defendant knowingly and intelligently waived his *Miranda* rights, the record supports the trial court's decision not to intervene. Thus, the trial court did not commit plain error by failing to exclude Defendant's statements to investigating officers.

### B. Ineffective Assistance of Counsel

[2] Secondly, Defendant contends that he received ineffective assistance from his trial counsel because his trial counsel failed to move to suppress or object to the admission of the verbal and written statements that were introduced into evidence. In order to establish that he has received ineffective assistance of counsel, Defendant must show (1) that "counsel's performance was deficient," meaning it "fell below an objective standard of reasonableness," and (2) that "the

deficient performance prejudiced the defense," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693 (1984). Ineffective assistance of counsel "claims brought on direct review will be decided on the merits when the cold record reveals that no further factual investigation is required, i.e., claims that may be developed and argued without such ancillary procedures as the appointment of investigators or an evidentiary hearing." *State v. Fair*, 354 N.C. 131, 166, 557 S.E.2d 500, 524 (2001), *cert. denied*, 535 U.S. 1114, 153 L. Ed. 2d 162 (2002). "Accordingly, should the reviewing court determine that [ineffective assistance of counsel] claims have been prematurely asserted on direct appeal, it shall dismiss those claims without prejudice to the defendant's right to reassert them during a subsequent [motion for appropriate relief] proceeding." *Id.*, 354 N.C. at 167, 557 S.E.2d at 525; *see also State v. Long*, 354 N.C. 534, 540, 557 S.E.2d 89, 93 (2001) (stating that "[t]he record discloses that in this case evidentiary issues may need to be developed before defendant will be in a position to adequately raise his possible [ineffective assistance of counsel] claim," so "[w]e direct that defendant not be precluded from raising this issue in a postconviction motion for appropriate relief"). In this case, the record reveals that certain evidentiary issues need further development before Defendant may adequately raise and the courts may adequately consider this claim, such as the showing, if any, that could have been made in support of Defendant's claims that the *Miranda* warnings given to him were inadequate and that he did not knowingly and intelligently waive his *Miranda* rights; the extent, if any, to which Defendant's trial counsel made a strategic or tactical decision to refrain from challenging the admission of Defendant's statements to investigating officers; and the extent, if any, to which any deficient performance on the part of Defendant's trial counsel in failing to challenge the admission of these statements prejudiced Defendant. As a result, consistently with the Supreme Court's decision in *Fair*, we decline to address Defendant's ineffective assistance of counsel claim at this time without prejudice to his right to assert it in a subsequent motion for appropriate relief and direct that Defendant not be precluded from raising this issue in any such postconviction petition he may choose to file.

## C. Adequacy of Interpreters at Trial

[3] Thirdly, Defendant challenges the adequacy of the interpreters that assisted him at trial on the basis that these individuals were not

certified by the Administrative Office of the Courts, that their dialects differed from his own,[2] and that the trial court failed to inquire about their fluency in the language that Defendant spoke. According to Defendant, the inadequacies of the interpreters deprived him of his constitutional right to a fair trial, confrontation, and due process of law. We disagree.

As a result of the fact that Defendant did not challenge the adequacy of the interpreters that assisted him at trial, Defendant contends that this Court must apply the plain error standard of review discussed above in determining whether he is entitled to relief on the basis of the alleged inadequacies of the interpreters who assisted him at trial. In arguing for the applicability of plain error review, Defendant relies upon this Court's ruling in *State v. Uvalle*, 151 N.C. App. 446, 452, 565 S.E.2d 727, 731 (2002), *disc. review denied*, 356 N.C. 692, 579 S.E.2d 95 (2003), in which a defendant's challenge to the adequacy of the interpretation services provided to him at trial was reviewed under a plain error standard. In *State v. Wiley*, 355 N.C. 592, 615, 565 S.E.2d 22, 39 (2002), *cert. denied*, 537 U.S. 1117, 154 L. Ed. 2d 795 (2003), however, our Supreme Court held that "an error, even one of constitutional magnitude, that [the] defendant does not bring to the trial court's attention is waived and will not be considered on appeal."[3] *State v. Smith*, 352 N.C. 531, 557-58, 532 S.E.2d 773, 790 (2000), *cert. denied*, 532 U.S. 949, 149 L. Ed. 2d 360 (2001); *see also State v. Nobles*, 350 N.C. 483, 498, 515 S.E.2d 885, 895 (1999). In addition, "plain error analysis applies only to jury instructions and evidentiary matters." *Wiley*, 355 N.C. at 615, 565 S.E.2d at 39-40. For that reason, Defendant's challenge to adequacy of the interpreters that assisted him in the trial court is not cognizable under the plain error doctrine.

Furthermore, the record reflects that the interpreters used at trial were ones that Defendant selected. Having procured the interpreters in question, Defendant is in no position to complain about the adequacy of their services. *State v. Chatman*, 308 N.C. 169, 177, 301 S.E.2d 71, 76 (1983) (stating that " 'Defendant cannot invalidate a trial

---

2. According to Defendant's brief, the interpreters spoke Lebanese Arabic, while he spoke "Sudanese Arabic combined with a native tongue of Egyptian Colloquial Arabic and local language of Donglawi." The record does not reflect that the trial court was aware of the existence of this language disparity.

3. *Wiley* was decided approximately one month prior to *Uvalle*. The restrictions upon the availability of plain error review enunciated in *Wiley* and the decisions upon which it relied in limiting the availability of plain error review to evidentiary and instructional issues were not mentioned in *Uvalle*.

by introducing evidence or eliciting evidence on cross-examination which he might have rightfully excluded if the same evidence had been offered by the State,' " since " 'invited error [is not] ground for a new trial' ") (quoting *State v. Waddell*, 289 N.C. 19, 25, 220 S.E.2d 293, 298 (1975), *vacated in part by* 428 U.S. 904, 49 L. Ed. 2d 1210 (1976), and citing *State v. Gaskill*, 256 N.C. 652, 657, 124 S.E.2d 873, 877 (1962); *State v. Williams*, 255 N.C. 82, 88, 120 S.E.2d 442, 447 (1961); *State v. Case*, 253 N.C. 130, 139, 116 S.E.2d 429, 435 (1960), *cert. denied*, 365 U.S. 830, 5 L. Ed. 2d 707 (1961); *State v. Payne*, 280 N.C. 170, 171, 185 S.E.2d 101, 102 (1971); *Overton v. Overton*, 260 N.C. 139, 145, 132 S.E.2d 349, 353 (1963)); see also N.C. Gen. Stat. § 15A-1443(c) (stating that "[a] defendant is not prejudiced by the granting of relief which he has sought or by error resulting from his own conduct").

Finally, even assuming that plain error review is available and that invited error considerations do not prohibit further examination of Defendant's argument, the record does not reflect that the two interpreters at trial were actually ineffective. One of the two interpreters was utilized for the purpose of assisting Defendant. However, Defendant testified, for the most part, in English and claimed that his English proficiency was "about 65 percent." The other interpreter was utilized to assist Defendant's brother Ibrahim. However, Ibrahim did not rely on the interpreter during his testimony to any appreciable extent either. Defendant has not directed our attention to any specific translation difficulties or other instances in which deficiencies in the translators' performances impaired Defendant's ability to "confront[] and cross-examin[e] the [S]tate's witnesses or [to] present[] its evidence for the jury's consideration," *Uvalle*, 151 N.C. App. at 452, 565 S.E.2d at 731, nor have we identified any such problems during our own review of the record. As a result, even if Defendant is entitled to plain error review of this claim, he has not shown any entitlement to relief.

### D. Acceptance of Defendant's Guilty Plea

[4] Fourth, Defendant argues that the trial court erred in accepting his plea of guilty to the charge of "obtaining property by false pretense" since the transcript of plea utilized in connection with his guilty plea bore the file number of a separate robbery with a dangerous weapon charge.[4] Although we agree that Defendant is correct in

---

4. Defendant also contends that the inclusion of the erroneous file number on the transcript of plea, "combined with the totality of the circumstances," including, among other things, his "background, inability to understand English, [and] the ineffective[ness] of his [trial] counsel, brings into question whether Defendant actually under-

noting that the transcript of plea in the false pretenses case bears the wrong file number, we conclude that the numbering mistake is a mere clerical error which should be corrected on remand rather than an error of law which entitles Defendant to relief from the trial court's judgment.

A "[c]lerical error has been defined . . . as 'an error resulting from a minor mistake or inadvertence, esp. in writing or copying something on the record, and not from judicial reasoning or determination.' " *State v. Taylor*, 156 N.C. App. 172, 177, 576 S.E.2d 114, 117-18 (2003) (quoting *State v. Jarman*, 140 N.C. App. 198, 202, 535 S.E.2d 875, 878 (2000), and citing *State v. Lineman*, 135 N.C. App. 734, 737-38, 522 S.E.2d 781, 784 (1999) (treating judgments that listed the incorrect class of the misdemeanor for which the defendant had been convicted and misstated the defendant's race as containing clerical errors); *State v. Hammond*, 307 N.C. 662, 669, 300 S.E.2d 361, 365 (1983) (treating a judgment and commitment form that listed robbery with a dangerous weapon as a Class C, rather than a Class D, felony as containing a clerical error). "When, on appeal, a clerical error is discovered in the trial court's judgment or order, it is appropriate to remand the case to the trial court for correction because of the importance that the record 'speak the truth.' " *State v. Smith*, 188 N.C. App. 842, 845, 656 S.E.2d 695, 696 (2008) (quoting *Linemann*, 135 N.C. App. at 738, 522 S.E.2d at 784); *see Taylor*, 156 N.C. App. at 177, 576 S.E.2d at 117-18.

As Defendant notes, the transcript of plea utilized in connection with Defendant's plea of guilty to obtaining property by false pretenses bore File No. 07 CRS 089148, which is the file number associated with the case in which Defendant was charged with committing robbery with a dangerous weapon on 29 April 2007, rather than File No. 07 CRS 088318, which is the file number associated with the case in which he was charged with obtaining property by false pretenses on 14 May 2007. Although Defendant argues that the fact that an erroneous file number appears on the transcript of plea "brings into question whether [he] actually understood his plea and the voluntariness thereof," the record clearly reflects that Defendant was apprised of the nature of the charge to which he was pleading guilty

---

stood his plea and the voluntariness thereof." However, since the "totality of the circumstances" test only comes into play in the event that the trial court fails to strictly comply with N.C. Gen. Stat. § 15A-1022, *State v. Hendricks*, 138 N.C. App. 668, 670, 531 S.E.2d 896, 898 (2000), and since Defendant has not established the existence of any noncompliance in this case, we need not examine the "totality of the circumstances" surrounding the entry of Defendant's plea.

and voluntarily entered a guilty plea to obtaining property by false pretenses in File No. 07 CRS 088318.[5] Prior to the beginning of the trial, the following exchange took place between Defendant and the trial court:

THE COURT: All right. Mr. Mohamed, you understand, sir, that your attorney is, on your behalf, admitting to guilt of the offense of obtaining property by false pretense. Do you authorize your attorney to do so?

(The defendant confers with [Defendant's Trial Counsel], off the record.)

DEFENDANT: I did use the credit card, but—

THE COURT: That's all—I just need to know if you're authorizing your attorney to admit your guilt to the obtaining property by false pretense—

DEFENDANT: Yes.

THE COURT: if you're doing so, because he's going to address that issue with the jury, and they will hear evidence of the whole transaction, which includes the obtaining property by false pretense. The jury will know that you're charged with that offense and admitting guilt to that offense, and that authorization has to be made by you, because the jury hears that information. So you're authorizing—are you authorizing your attorney to admit your guilt to the offense of obtaining property by false pretense?

DEFENDANT: Yes.

5. Defendant also notes that the transcript of plea mentions the robbery with a dangerous weapon charge in File No. 07 CRS 089148 with an offense date of 29 April 2007 and the robbery with a dangerous weapon charge in File No. 07 CRS 088319 with an offense date of 14 May 2007. Although Defendant contends that the fact that these two charges are listed on the transcript of plea provides further indication that the validity of Defendant's plea should be deemed suspect, the fact that both charges are stricken through on the plea transcript and the fact that the record contains no indication that Defendant attempted to enter a plea of guilty to any charge other than obtaining property by false pretenses convinces us that the presence of these two robbery with a dangerous weapon charges on the plea transcript had no effect on Defendant's decision to enter a plea of guilty to obtaining property by false pretenses.

THE COURT:    All right, and you're obviously entering a plea of not guilty to the offense of robbery with a dangerous weapon, is that correct?

DEFENDANT: Yes.

After the presentation of the evidence, but prior to the submission of the case to the jury, Defendant entered a plea of guilty to obtaining property by false pretenses in a proceeding that was conducted in full compliance with the procedures specified in N.C. Gen. Stat. § 15A-1022. After accepting the jury's verdict convicting Defendant of robbery with a dangerous weapon, the trial court found that "the defendant [had] pled guilty to the offense of obtaining property by false pretense, a Class H felony, in 07 CRS 88318 . . . ." Furthermore, the "pleas" section of the "transcript of plea" strikes through the "robbery with a dangerous weapon" offense in File No. 07 CRS 089148 and designates the "obtaining property by false pretense" offense using the correct file number, 07 CRS 88318 as the offense to which Defendant pled guilty. A careful study of the record clearly reveals that the fact that the caption on the transcript of plea bears File No. 07 CRS 089148 is a simple inadvertence rather than a mistake resulting "from judicial reasoning or determination." *Taylor*, 156 N.C. App. at 177, 576 S.E.2d at 117-18. As such, we remand this case to the trial court for the limited purpose of correcting the clerical error that appears on the transcript of plea utilized in connection with Defendant's plea of guilty to obtaining property by false pretenses in File No. 07 CRS 088318.

### E. Evidence Concerning Unrelated Robbery

[5] Fifth, Defendant contends that the trial court erred by allowing the admission of testimony concerning a separate robbery on the grounds that the trial court's ruling subjected him to "unfair prejudice which substantially outweighed the probative value of [such] evidence." We disagree.

The admissibility of "other bad acts" evidence is governed by N.C. Gen. Stat. § 8C-1, Rule 404(b).

> Rule 404 (b) is a rule of inclusion, subject to the single exception that such evidence must be excluded if its *only* probative value is to show that defendant has the propensity or disposition to commit an offense of the nature of the crime charged. *State v. Berry*, 356 N.C. 490, 505, 573 S.E.2d 132, 143 (2002). In order for evidence to be admissible under Rule 404(b), it "must be offered for

a proper purpose, must be relevant, must have probative value that is not substantially outweighed by the danger of unfair prejudice to the defendant, and, if requested, must be coupled with a limiting instruction." *State v. Haskins*, 104 N.C. App. 675, 679, 411 S.E.2d 376, 380 (1991), *disc. review denied*, 331 N.C. 287, 417 S.E.2d 256 (1992).

*State v. Corum*, 176 N.C. App. 150, 156, 625 S.E.2d 889, 893 (2006). "[E]vidence that [a] defendant committed similar acts which are not too remote in time may be admitted to show that these acts and those for which the defendant is being tried all arose out of a common scheme or plan on the part of the defendant." *State v. Rosier*, 322 N.C. 826, 828, 370 S.E.2d 359, 360-61 (1988). In addition, evidence of a prior bad act is admissible to establish the defendant's identity. N.C. Gen. Stat. § 8C-1, Rule 404(b); *Corum*, 176 N.C. App. at 156, 625 S.E.2d at 893. "[T]he ultimate test for determining whether such evidence is admissible is whether the incidents are sufficiently similar and not so remote in time as to be more probative than prejudicial under the balancing test of [N.C. Gen. Stat.] § 8C-1, Rule 403." *State v. Davis*, 340 N.C. 1, 14, 455 S.E.2d 627, 634 )1995) (quoting *State v. Boyd*, 321 N.C. 574, 577, 364 S.E.2d 118, 119 (1988)).

At trial, the State offered evidence that one or more black males with African accents robbed John Rock with a handgun in Greensboro on the evening of 29 April 2007. The perpetrators fled the scene on foot after taking Mr. Rock's wallet and iPod. Mr. Rock identified Defendant as one of the robbers from a photographic lineup. Within thirty minutes of the robbery, Defendant used Mr. Rock's debit card to purchase items at the same Shell station at which the purchase at issue in this case was made. After deciding to admit evidence of the robbery of Mr. Rock, the trial court gave a limiting instruction in which it informed the members of the jury that:

this evidence is being presented by the State which may indicate that the defendant may have committed some similar offense at an earlier time. Now whether the incident is so similar is for you to determine and the weight to be given to that. Please remember that this is not evidence of the defendant's guilt in this case. You may not convict the defendant on the present charges because of something that the defendant may or may not have done in the past.

Subsequently, in its final instructions to the jury, the trial court instructed the jury that "[e]vidence has been received tending to

show that the defendant may have committed a similar offense;" that "[t]his evidence was received solely for the purpose of showing that there existed in the mind of the defendant a plan, scheme, system, or design involving the crime charged in this case;" and that, "[i]f you believe this evidence, you may consider it, but only for the limited purpose for which it was received."

The similarities between the two robberies are striking, including the fact that the victims were robbed of their credit or debit cards by one or more handgun-wielding individuals with African accents, which were then used by. Defendant to purchase gas at the same Shell station within a very short period of time. The evidence in question was, for that reason, admissible under N.C. Gen. Stat. § 8C-1, Rule 404(b), since it tends to prove both a common plan or scheme on the part of Defendant involving both robberies and the Defendant's identity as the perpetrator of the robbery for which he was being tried. In addition, the trial court did not abuse its discretion by failing to exclude the evidence relating to the other robbery pursuant to N.C. Gen. Stat. § 8C-1, Rule 403. As a result, the trial court did not err by admitting evidence of the prior robbery.

### F. Motion to Dismiss

[6] Finally, Defendant argues that the trial court erred by denying his motion to dismiss the charge of robbery with a dangerous weapon at the close of all evidence on the grounds that the evidence was insufficient to justify a guilty verdict. We disagree.

> When a defendant moves for dismissal, the trial court is to determine only whether there is substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense. *State v. Earnhardt*, 307 N.C. 62, 65-66, 296 S.E.2d 649, 651 (1982). Whether evidence presented constitutes substantial evidence is a question of law for the court. *Id.* at 66, 296 S.E.2d at 652. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). The term "substantial evidence" simply means "that the evidence must be existing and real, not just seeming or imaginary." *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980).

*State v. Vause*, 328 N.C. 231, 236, 400 S.E.2d 57, 61 (1991). The trial court must consider the record evidence in the light most favorable to the State, giving the State the benefit of every reasonable inference

that may be drawn from it. *Id.* at 237, 400 S.E.2d at 61. "The test of the sufficiency of the evidence to withstand the defendant's motion to dismiss is the same whether the evidence is direct, circumstantial, or both." *Id.*

The elements of robbery with a dangerous weapon are "(1) an unlawful taking or an attempt to take personal property from the person or in the presence of another, (2) by use or threatened use of a firearm or other dangerous weapon, (3) whereby the life of a person is endangered or threatened." *State v. Call*, 349 N.C. 382, 417, 508 S.E.2d 496, 518 (1998), *cert. denied*, 534 U.S. 1046, 151 L. Ed. 2d 548 (2001); see N.C. Gen. Stat. § 14-87(a). According to Defendant, with the exception of the victim's testimony that the perpetrator had an African accent and that Defendant resembled the gunman from the nose down, there is no evidence that links him to the actual robbery once his statements to investigating officers are disregarded. On the other hand, according to Defendant, Mr. Whitlock estimated that the robber was 5'11" tall, while Defendant is only 5'8". Based on a careful review of the record, however, we conclude that there is substantial evidence that Defendant perpetrated the crime of which he was convicted under the doctrine of recent possession.

The doctrine of recent possession allows the jury to infer that the possessor of recently stolen property is guilty of taking it. *State v. Reid*, 151 N.C. App. 379, 382, 565 S.E.2d 747, 750, *appeal dismissed*, 356 N.C. 622, 575 S.E.2d 522 (2002) (citing *State v. Pickard*, 143 N.C. App. 485, 487, 547 S.E.2d 102, 104, *disc. review denied*, 354 N.C. 73, 553 S.E.2d 210 (2001)). The doctrine of recent possession applies where the State proves (1) that the property was stolen; (2) that the defendant had possession of the stolen property, which means that he was aware of its presence and, either by himself or collectively with others, had both the power and intent to control its disposition or use; and (3) that defendant's possession of the stolen property occurred so soon after it was stolen and under such circumstances that it is unlikely he obtained possession honestly. *Id.*

In this case, Mr. Whitlock testified that he reported his credit card stolen on 14 May 2007. The testimony of Mr. Tessma, the surveillance video, and the credit card receipt establish that Defendant possessed and used the stolen property. In addition, Officer McSweeney testified that "the robbery occurred [at] 8:50" p.m., while the receipt relating to Defendant's transaction at the Shell station was time-stamped 8:56 p.m., indicating that Defendant possessed Mr. Whitlock's credit card within six minutes of the robbery. Finally, the evidence concern-

ing Defendant's involvement in the robbery of Mr. Rock provides further support for an inference that Defendant was the perpetrator of the robbery of Mr. Whitlock. Thus, when viewed in the light most favorable to the State, the record contains more than sufficient evidence to support Defendant's conviction for robbery with a dangerous weapon even if Defendant's statements to Officer Miller are disregarded.[6] For that reason, the trial court properly denied Defendant's dismissal motion.

### Conclusion

As a result, for the reasons set out above, we conclude that Defendant received a fair trial, free from prejudicial error. Thus, the trial court's judgment should remain undisturbed. However, we remand this case to the trial court for correction of the clerical error on the transcript of plea utilized in connection with Defendant's plea of guilty to obtaining property by false pretenses in File No. 07 CRS 088318.[7]

NO ERROR; REMAND TO CORRECT CLERICAL ERROR.

Chief Judge MARTIN and Judge ROBERT C. HUNTER concur.

---

6. Needless to say, there is no reason to disregard Defendant's statements to Officer Miller in determining the sufficiency of the evidence to support Defendant's conviction for robbery with a dangerous weapon.

7. The result which we have reached in this opinion renders the State's Motion to Strike Material Outside the Record from the Filed Record on Appeal and from Defendant-Appellant's Brief moot, since the materials which were the subject of the State's motion did not affect our disposition of Defendant's challenge to the trial court's judgment. Similarly, it is also unnecessary for us to consider Defendant's Motion to Supplement Record on Appeal and Motion for Judicial Notice, since the issuance of this opinion renders that motion moot for the same reason.