STATE OF NORTH CAROLINA v. ARMANDO ORTEZ

No. COA05-711

(Filed 5 July 2006)

### 1. Confessions and Incriminating Statements— Miranda warnings—flawed translation to Spanish

The Spanish translations of Miranda warnings used here contained grammatical errors, but reasonably informed defendant of his rights.

### 2. Confessions and Incriminating Statements— knowing waiver of rights—borderline IQ—Spanish only speaker

The trial court's unchallenged findings of fact support its conclusion of a knowing waiver of rights by a defendant with borderline or low average intellectual function who spoke only Spanish.

### 3. Criminal Law— motion for mistrial—jailhouse statement produced during trial

The trial court did not abuse its discretion by denying defendant's motion for a mistrial after a prisoner came forward during the trial to report a jailhouse conversation with defendant. There was no argument that the State violated discovery procedures, only that the statement contradicted defense counsel's opening statement. While the prisoner's statement was materially adverse to defendant's case, it did not cause substantial and irreparable prejudice.

Appeal by defendant from judgment entered 31 October 2003 by Judge John R. Jolly, Jr., in Superior Court, Wake County. Heard in the Court of Appeals 7 March 2006.

*Attorney General Roy Cooper, by Assistant Attorney General Robert C. Montgomery, for the State.*

*Glover & Petersen, P.A., by Ann B. Petersen, for defendant-appellant.*

McGEE, Judge.

Armando Ortez (defendant) was convicted of first-degree murder under the felony murder rule. The trial court sentenced defendant to life imprisonment without parole.

**STATE v. ORTEZ**

[178 N.C. App. 236 (2006)]

Defendant filed a motion for a pre-trial hearing "to determine that . . . defendant [was] mentally retarded." The trial court conducted a hearing on 14 July 2003 to determine whether defendant was mentally retarded. At the hearing, Dr. Antonio Puente (Dr. Puente) testified on behalf of defendant as an expert in neuropsychology. Dr. Puente testified that he conducted a series of intelligence tests on defendant in November 2002 and in March 2003. Dr. Puente testified that defendant's IQ scores ranged from 55 to 75 and that defendant's mean score on all the tests was 64.6. Dr. Puente determined that defendant was mildly mentally retarded. Dr. Puente testified that defendant's mental retardation manifested itself before defendant reached the age of eighteen.

Dr. Patricio Lara (Dr. Lara) also testified on behalf of defendant as an expert in forensic psychiatry. Dr. Lara testified that he evaluated defendant on three different occasions in April and June of 2003, and also reviewed Dr. Puente's findings. Dr. Lara testified that defendant was mildly mentally retarded.

Dr. Jennifer Schnitzer (Dr. Schnitzer) testified for the State as an expert in forensic psychology. Dr. Schnitzer testified that she administered a series of intelligence tests to defendant. Dr. Schnitzer testified that, based upon the results of one of the tests, defendant's IQ was as high as 77. Dr. Schnitzer testified that defendant was not mentally retarded. Rather, Dr. Schnitzer testified that she diagnosed defendant with "borderline intellectual functioning."

Dr. Charles Vance (Dr. Vance) testified for the State as an expert in forensic psychiatry. Dr. Vance testified that he did not think defendant was mentally retarded. Dr. Vance further stated as follows: "I cannot say for sure whether [defendant's] IQ falls in the range of borderline intellectual functioning or low average, but normal intellectual functioning—and that's why we diagnosed him with provisional—the provisional diagnosis, borderline intellectual functioning."

The trial court found that defendant had failed to prove "by clear and convincing evidence that he [was] mentally retarded and that such [mental retardation] manifested itself before he became [eighteen] years of age." The trial court also found "[t]hat the State of North Carolina [was] not precluded from seeking the death penalty against . . . [d]efendant."

Defendant also filed a pre-trial motion to suppress statements made by defendant during an interrogation at the Raleigh Police

Department on 7 August 2002, the day of his arrest, citing the following reasons:

(1) The defendant did not understand his rights under <u>Miranda v. Arizona</u>, 38[4] U.S. 436 (1966);

(2) The defendant did not knowingly and intelligently waive his <u>Miranda</u> rights;

(3) The defendant did not voluntarily waive his <u>Miranda</u> rights;

(4) The alleged statement the defendant gave to the police was involuntarily given;

(5) The defendant's alleged statement is unreliable;

(6) The defendant's alleged statement was taken in violation of the Vienna Convention on Consular Relations[.]

The trial court conducted a hearing on 24 July 2003 and 31 July 2003 on defendant's motion to suppress his statements. At the suppression hearing, the State presented testimony of Raleigh Police Detective Dale Montague (Detective Montague), Detective Randy Miller (Detective Miller), and Officer Isaac Perez (Officer Perez). Detectives Montague and Miller conducted an interrogation of defendant and testified in detail regarding their interrogation. Officer Perez, who was fluent in Spanish, testified that he served as interpreter during the interrogation. Officer Perez testified that he read defendant his *Miranda* rights in Spanish from a pre-printed *Miranda* rights waiver form (the waiver form). Detective Montague and Officer Perez testified that defendant signed the waiver form.

At the suppression hearing, defendant presented testimony of Eta Trabing (Ms. Trabing), a certified English and Spanish interpreter. Ms. Trabing testified regarding the waiver form which was read to defendant, and signed by him at the beginning of the interrogation session. Ms. Trabing testified that the phrase "corte de ley," used on the waiver form, had no meaning in Spanish. Ms. Trabing also testified that the word "interrogatorio," used on the waiver form as a translation for the word "questioning," "implie[d] something very formal and usually where the party that [was] asking the questions [was] in a position of authority." Ms. Trabing further testified that nothing on the waiver form informed defendant that an attorney would be appointed for him if he was unable to afford one. Rather, the waiver form, translated into English, read as follows: "[I]f you want a lawyer and cannot get

one, for you one will be named for you so that for you he can represent you during the interrogatory."

Dr. Puente and Dr. Lara also testified at the suppression hearing. Their testimony at the suppression hearing was substantially similar to their testimony at the earlier hearing regarding whether defendant was mentally retarded. However, Dr. Lara also testified that defendant did not understand the *Miranda* rights as they were read to him by Officer Perez.

The trial court denied defendant's motion to suppress, concluding that defendant made his statements "freely, voluntarily, and understandingly." The trial court made the following uncontested findings of fact:

57. That . . . [d]efendant appeared alert and did not appear to be impaired in any manner.

58. That . . . [d]efendant did not appear tired.

59. That . . . [d]efendant appeared to understand.

. . .

67. That the interview of . . . defendant lasted approximately one and one half to two hours.

68. That during the course of the interview, . . . defendant requested food.

69. That the Detectives responded to the request for food by immediately taking a 45 minute break during which time they provided food and drink to . . . defendant.

70. That . . . [d]efendant's responses to the questions asked by the Detectives were reasonable and appropriate to the questions posed.

. . .

72. That the interview was conducted in a conversational tone and at no time did either . . . [d]efendant or the officers raise their voices.

73. That the officers did not threaten . . . defendant with violence or make a show of violence at any point during the course of the interview.

74. That the officers did not make promises, offer rewards or any other inducements to get . . . [d]efendant to make a statement.

. . .

77. That Officer Perez did not have difficulty in communicating with . . . [d]efendant and there were no long pauses between the questions posed by Detective Montague through Officer Perez and the responses provided by . . . defendant.

78. That this was not . . . [d]efendant's first experience with law enforcement officers.

79. That . . . [d]efendant's prior experience with law enforcement includes an incident with the Apex Police Department.

80. That on June 30, 2002, Apex Police Officer W.T. Allen arrested . . . [d]efendant for Breaking and Entering a Motor Vehicle.

81. That after arresting . . . [d]efendant, Officer Allen advised . . . [d]efendant of his Miranda rights.

82. That . . . [d]efendant indicated to Officer Allen on June 30, 2002 that he did not speak English after being advised of his Miranda rights (in English).

83. That as Officer Allen was transporting . . . [d]efendant to jail for processing, . . . [d]efendant apologized for what he had done in English.

84. That on July 22, 2002, less than three weeks from the August 7, 2002 interview, . . . [d]efendant appeared in Wake County District Court and entered a plea of guilty to felony Breaking and Entering a Motor Vehicle.

85. That on July 22, 2002, . . . [d]efendant was represented by a court appointed attorney.

86. That the District Court Judge specifically found on July 22, 2002 that . . . [d]efendant's plea was the informed choice of . . . [d]efendant and that it was made freely, voluntarily and understandingly.

At trial, the State's evidence tended to show that Nguyen Truong (the victim) owned Brightwash Laundromat (the laundromat) in downtown Raleigh. Michael Boone (Boone) went to the laundromat at approximately 6:30 p.m. on 26 July 2002 and saw three Hispanic

men standing outside the laundromat. Boone went inside and then came back out and sat down. One of the Hispanic men went inside the laundromat and the other two men remained outside. Boone later identified defendant as one of the two men who was outside the laundromat. Boone left the laundromat about 7:00 p.m.

Devaughn Cros (Cros) also passed by the laundromat at approximately 6:30 p.m. on 26 July 2002 and observed three "Mexican". males standing outside the laundromat. A short time later, Cros again passed by the laundromat and saw only two men outside the laundromat.

Later that evening, neighborhood children noticed the victim's truck, with its lights on, in the parking lot of the laundromat. The inside of the laundromat was dark. One of the children looked inside the laundromat and yelled that the victim was dead. The children informed adults, who called 911.

When police and paramedics arrived at the laundromat on 26 July 2002, they found the victim lying inside the laundromat in a large pool of blood, with fifty-six "cutting type wounds" to his torso, head, and arms. There was blood and blood splatter in multiple places in the laundromat. Some of the blood was later identified as matching that of the victim and some was identified as coming from an unknown individual. Bloody shoe tracks were found throughout the laundromat, and a bloody palm print was found on a cooler inside the laundromat. The palm print was later identified as defendant's print. A warrant was issued for defendant's arrest on 2 August 2002 and he was arrested on 7 August 2002.

Detective Montague testified that he conducted an interrogation of defendant. During the interrogation, defendant admitted he was at the laundromat when the victim was killed but denied participating in the actual murder. Defendant said he met two Mexican men earlier that day, and that one of the men suggested they rob the "Chinese man." Defendant said they did not plan the robbery, but talked about the robbery for three or four minutes before entering the laundromat. No one discussed murdering the victim. Defendant also admitted that after he saw one of the men stabbing the victim, defendant grabbed the victim's wallet and watch. Defendant jumped over the counter to look for money, but found none; instead, defendant stole some cigarettes. The three men then tried to steal the victim's truck but were unable to operate it, and fled on foot. Defendant threw the wallet in a

dumpster and kept the watch. During defendant's interview, when asked about the watch, defendant reached into his pocket and produced the watch.

The State's evidence further showed that between 7:00 p.m. and 8:00 p.m., on 26 July 2002, two Hispanic males approached Emily Watkins (Watkins) and three other people, who were sitting on the porch of her father's home, which was located within walking distance of the laundromat. One of the men tried to sell Watkins a gold necklace. However, Watkins saw blood on the necklace and gave it back to the man. Watkins also noticed blood on the man's shirt, shorts, and hand. Watkins later identified a necklace worn by the victim in a photograph as being the same necklace that the man had tried to sell to her. Watkins identified Gonzalo Garcia as the man who had approached her with the necklace.

Crystal Evans (Evans) also testified that she was on the porch with Watkins on 26 July 2002 when two Hispanic males approached and tried to sell them a necklace. Evans testified that the necklace had blood on it and that Watkins told the men to leave. Evans testified the Hispanic males took the necklace and left. Evans further testified that on 4 September 2003, she talked with her brother, Adam Horton (Horton), who was then in custody at the Wake County Detention Center on charges unrelated to the present case. Evans testified that she told Horton she had been subpoenaed to testify in a "murder trial between a Mexican and a Chinese man," about a murder that had occurred at the laundromat. Evans testified that Horton indicated he had information about the murder.

During defendant's opening statement, defendant's counsel presented a theory of defense that the evidence would prove that someone other than defendant killed the victim. Horton testified for the State that in September 2003, while he and defendant were incarcerated on the ninth floor of the Wake County Detention Center, defendant told Horton that defendant had stabbed the victim "mucho times" in the face and had taken a chain from the victim's neck. Horton testified that defendant told him this information one night after midnight. Because Horton did not tell the State that he had relevant information until 9 October 2003, defendant was not notified of Horton's intent to testify until mid-trial. Defendant filed a motion for mistrial on 13 October 2003. The trial court denied the motion.

Defendant presented evidence at trial. Watkins, who had testified for the State, testified that she did not recognize defendant as one of

the two men who had walked up to her father's house with a necklace on 26 July 2002.

William Hensley (Hensley) testified that he owned a forensics company, and was a retired crime scene agent for CCBI. Hensley testified that in deaths involving multiple stab wounds, it was very common for an assailant to cut himself and thereby become a secondary bleeder. Hensley further testified that in the present case, there was an unidentified secondary bleeder.

Wanda Strickland (Strickland) testified that she was an administrative officer at the Wake County Detention Center. Strickland testified that records indicated Horton had been transferred to the ninth floor of the Wake County Detention Center between 2:00 p.m. and 3:00 p.m. on 4 September 2003. Strickland also testified there was no way Horton could have slept on the ninth floor on the evening of 3 September 2003 or in the early morning hours of 4 September 2003. On cross-examination, Strickland testified that Horton would have slept on the ninth floor of the Wake County Detention Center after 2:00 p.m. on 4 September 2003. Strickland also testified that defendant was in the same location as Horton as of 2:00 p.m. on 4 September 2003, and that defendant had been in that location since 27 August 2003.

Defendant was convicted of first-degree murder on 22 October 2003, based on the felony murder rule. Because the jury could not reach a unanimous decision as to whether defendant was mentally retarded, the trial court entered judgment for first-degree murder and sentenced defendant to life imprisonment without parole on 31 October 2003. Defendant appeals.

I.

Defendant first argues the trial court erred in denying his motion to suppress his statements because: (1) defendant was not adequately advised of his *Miranda* rights and (2) defendant did not knowingly and intelligently waive his *Miranda* rights. Defendant also contends the trial court failed to make findings which resolved disputed material facts concerning a waiver.

Our standard of review of an order granting or denying a motion to suppress is "strictly limited to determining whether the trial [court's] underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the [trial court's] ulti-

mate conclusions of law." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). A trial court's conclusions concerning the voluntariness of a defendant's statement are reviewable *de novo* on appeal. *State v. Hardy*, 339 N.C. 207, 222, 451 S.E.2d 600, 608 (1994). When a defendant's waiver of *Miranda* rights arises under the same circumstances as the making of his statement, the voluntariness issues may be evaluated as a single matter. *State v. Mahatha*, 157 N.C. App. 183, 194, 578 S.E.2d 617, 624, *disc. review denied*, 357 N.C. 466, 586 S.E.2d 773 (2003).

## A. Adequacy of Defendant's *Miranda* Warnings

**[1]** The Fifth Amendment of the United States Constitution prohibits compelling any person in a criminal case to incriminate himself or herself. U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966), the United States Supreme Court articulated warnings to protect this constitutional right. Prior to custodial interrogations, a person must be advised that he

> has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* at 479, 16 L. Ed. 2d at 726. Without these warnings, any statement made by a defendant during a custodial interrogation may not be admissible at trial. *Id.*

In the present case, defendant challenges the adequacy of his *Miranda* warnings. Specifically, defendant argues that the Spanish translation of the *Miranda* warning read to him was "inadequate to convey to [defendant] the substance of his *Miranda* rights." Defendant contends that a phrase used, "corte de ley," has no meaning in Spanish and takes issue with the use of it for a translation of the phrase, "court of law." Defendant contends the proper translation for "court" would be "tribunal de justicia." Defendant also states that the Spanish translation read to him used the word "interrogatorio" for the word "questioning." Defendant contends "interrogatorio" refers to a "formal proceeding, such as a court trial." Finally, defendant claims that the Spanish translation of the *Miranda* rights read to him did not properly convey the right of an indigent defendant to have counsel appointed before questioning. Although the Spanish translation of *Miranda* warnings used by the Raleigh Police Department in this case contained grammatical errors, we do not find these errors ren-

STATE v. ORTEZ

[178 N.C. App. 236 (2006)]

dered defendant's *Miranda* warnings inadequate. The United States Supreme Court has never required *Miranda* warnings to "be given in the exact form described in that decision." *Duckworth v. Eagan*, 492 U.S. 195, 202, 106 L. E. 2d 166, 176 (1989). When reviewing the adequacy of *Miranda* warnings, an appellate court asks "simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by [*Miranda*].' " *Id.* at 203, 106 L. Ed. 2d at 177 (quoting *California v. Prysock*, 453 U.S. 355, 361, 69 L. Ed. 2d 696, 702 (1981)).

In the present case, the warnings read to defendant in Spanish reasonably conveyed to defendant his *Miranda* rights and were therefore adequate. While defendant argues the term "corte de ley" has no meaning in Spanish, when defendant was asked in Spanish whether he understood his rights, defendant answered in the affirmative and signed the bottom of the waiver form. Moreover, a material part of the *Miranda* warning given—that anything defendant said could be used against him—was preserved in the translation.

Defendant also argues the term "interrogatorio" signifies a more formal proceeding than the word "questioning." Defendant's witness, Ms. Trabing, testified that the term " 'interrogatorio' implie[d] something very formal and usually where the party that [was] asking the questions [was] in a position of authority." In *Miranda*, the Supreme Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 16 L. Ed. 2d at 706. This definition is very similar to the definition of "interrogatorio" provided by Ms. Trabing. Defendant was clearly subjected to custodial interrogation because defendant was: (1) arrested, handcuffed, and brought into the Raleigh Police Department in a police vehicle; (2) read his *Miranda* rights in Spanish; and (3) questioned in a room with three officers present. While "interrogatorio" may be an imprecise translation of "questioning," it does not render defendant's *Miranda* warning inadequate.

Finally, defendant challenges the Spanish translation of his final *Miranda* right, which reads as follows: "If you want a lawyer and cannot get one, for you one will be named for you so that for you he can represent you during the interrogatory." Defendant argues that because he was not informed that the "naming" of an attorney could come without cost to him, the warning was inadequate. We disagree.

Defendant relies upon *United States v. Perez-Lopez*, 348 F.3d 839 (9th Cir. 2003). In *Perez-Lopez*, the defendant was advised of his *Miranda* rights in Spanish. *Id.* at 843. Translated into English, the defendant received the following warning: "[Y]ou have the right to solicit the court for an attorney if you have no funds." *Id.* at 847. The Ninth Circuit held that the warning was constitutionally inadequate because it did not inform the defendant that the government had an obligation to appoint an attorney for him if he was indigent. *Id.* at 848. The *Perez-Lopez* court further explained that "[t]o be required to 'solicit' the court, in the words of [the] warning, implies the possibility of rejection." *Id.*

In the present case, the warning given to defendant did not imply that defendant's request for an attorney could be rejected. The warning given to defendant was broader than the warning in *Perez-Lopez*, providing that a lawyer would be named for defendant if he could not get one for any reason. Thus, the translation reasonably conveyed to defendant his right to have counsel named for him. Because the warnings given to defendant were sufficient to reasonably convey to defendant each of his *Miranda* rights, we find no error.

### B. Defendant's Waiver of his *Miranda* Rights

[2] Defendant argues that the evidence presented at the suppression hearing did not support the trial court's conclusion that defendant freely, knowingly, intelligently, and voluntarily waived his *Miranda* rights. Defendant further contends the trial court erred by failing to make findings of fact resolving disputed issues concerning defendant's waiver of his *Miranda* rights. We disagree.

A defendant may choose to waive his *Miranda* rights. *Miranda*, 384 U.S. at 479, 16 L. Ed. 2d at 726. However, "unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against [a defendant]." *Id.* The State has the burden of proving that a defendant's waiver of his *Miranda* rights was knowing and intelligent. *State v. Simpson*, 314 N.C. 359, 367, 334 S.E.2d 53, 59 (1985). "Whether a waiver is knowingly and intelligently made depends on the specific facts and circumstances of each case, including the background, experience, and conduct of the accused." *Id.* In considering the totality of the circumstances, we examine the following: (1) a defendant's familiarity with the criminal justice system, (2) the length of a defendant's interrogation, (3) the amount of time a defendant was without sleep, (4) whether a defendant was held incommunicado, (5) whether

threats of violence were made against a defendant, (6) whether promises were made to a defendant to obtain a statement, (7) whether a defendant was deprived of food, and (8) a defendant's age and mental condition. *State v. Kemmerlin*, 356 N.C. 446, 458, 573 S.E.2d 870, 880-81 (2002). "The presence or absence of any one of these factors is not determinative." *Id.*

"When there is a *material* conflict in the evidence on *voir dire*, the [trial court] *must* make findings of fact resolving any such material conflict." *State v. Lang*, 309 N.C. 512, 520, 308 S.E.2d 317, 321 (1983). However, these findings of fact need not summarize all of the evidence presented at the suppression hearing. *State v. Dunlap*, 298 N.C. 725, 730-31, 259 S.E.2d 893, 896 (1979).

Defendant specifically argues that the trial court failed to make findings of fact resolving disputed issues surrounding defendant's level of intelligence and defendant's capacity to understand and waive his *Miranda* rights. However, there was not a material conflict regarding defendant's level of intelligence. The trial court found that defendant was of "borderline intellectual or low average functioning" if not "mildly mentally retarded." In evaluating whether a waiver was knowing and intelligent in a case involving a mentally retarded defendant, we must look to the totality of the circumstances, paying particular attention to the defendant's personal characteristics and the details of the interrogation. *State v. Fincher*, 309 N.C. 1, 19, 305 S.E.2d 685, 696-97 (1983). "[A] defendant's subnormal mental capacity is a factor to be considered when determining whether a knowing and intelligent waiver of rights has been made. Such lack of intelligence does not, however, standing alone, render an in-custody statement incompetent if it is in all other respects voluntary and understandingly made." *Id.* at 8, 305 S.E.2d at 690 (internal citations omitted).

In the present case, the trial court's unchallenged findings of fact support the trial court's conclusion that defendant made a knowing, intelligent, and voluntary waiver of his *Miranda* rights. The trial court found that defendant was read his *Miranda* rights in Spanish. The trial court found that defendant said he understood his rights and wanted to give a statement to the officers. Defendant's testing showed he had an IQ ranging from 55 to 77, classifying him as mildly mentally retarded to borderline intellectual or low average functioning. However, as stated above, defendant's IQ alone does not mean defendant could not make a voluntary, knowing and intelligent waiver of his *Miranda* rights. *See Fincher*, 309 N.C. at 8, 305 S.E.2d at 690.

Defendant had previous experience in the criminal justice system, having been arrested on 30 June 2002 on a charge of breaking into and stealing from a car. In the prior case, defendant was read his *Miranda* rights in English. He responded in Spanish that he did not understand English. However, ultimately defendant entered a plea of guilty to felony breaking and entering a motor vehicle and the trial court found defendant made the plea freely, voluntarily and understandingly.

In the present case, the unchallenged findings of fact also demonstrate that the length of the interrogation was not unusual or excessive. Defendant was not deprived of sleep, nor were there any threats of violence. When defendant indicated he was hungry, he was given food and drink. When defendant was addressed in Spanish, he did not indicate that he was confused or that he did not understand what was happening. Rather, defendant appeared to understand the questions asked and gave reasonable and appropriate answers. There were no long pauses between the questions asked and defendant's responses. We conclude that the trial court's findings adequately support the trial court's conclusions:

> 4. That the statement made by . . . [d]efendant to Officer Perez, Inspector Montague and Inspector Miller on August 7, 2002, was made freely, voluntarily, and understandingly.

> 5. That . . . [d]efendant was in full understanding of his Constitutional right to remain silent and right to counsel, and all other rights.

> 6. That . . . [d]efendant freely, knowingly, intelligently, and voluntarily waived each of those rights and thereupon made the statement to the officers above-mentioned.

We overrule defendant's assignments of error grouped under this argument.

## II.

[3] Defendant argues the trial court abused its discretion by denying defendant's motion for a mistrial. Horton came forward in the middle of defendant's trial, claiming to have information related to defendant's case. Horton said he and defendant were incarcerated together during September 2003. During that time, defendant told Horton that defendant and the other Hispanic males robbed the victim, and that when the robbery went wrong, defendant stabbed the victim "mucho times." When defendant learned of Horton's intended testimony, defendant moved for a mistrial on the basis that Horton's testimony

STATE v. ORTEZ

[178 N.C. App. 236 (2006)]

conflicted with defendant's opening statement and thus resulted in substantial and irreparable prejudice to defendant's case. The trial court denied defendant's motion for a mistrial.

Under N.C. Gen. Stat. § 15A-1061 (2005), a trial court "must declare a mistrial upon the defendant's motion if there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, resulting in substantial and irreparable prejudice to the defendant's case." The decision to grant or deny a motion for mistrial is within the sound discretion of the trial court, and the motion will be granted "only when there are such serious improprieties as would make it impossible to attain a fair and impartial verdict under the law." *State v. Calloway*, 305 N.C. 747, 754, 291 S.E.2d 622, 627 (1982).

Defendant does not argue that the State violated any discovery requirements because the State did not learn that Horton had potentially relevant information until mid-trial. Rather, defendant alleges that the admission of Horton's testimony contradicted the theory of defense staked out by defense counsel in defendant's opening statement.

Defendant relies upon *State v. Moorman*, 320 N.C. 387, 358 S.E.2d 502 (1987), in which our Supreme Court held·that the defendant received ineffective assistance of counsel. *Id.* at 402, 358 S.E.2d at 511-12. Our Supreme Court recognized that "[a] cardinal tenet of successful advocacy is that the advocate be unquestionably credible. If the fact finder loses confidence in the credibility of the advocate, it loses confidence in the credibility of the advocate's cause." *Id.* at 400, 358 S.E.2d at 510. However, *Moorman* is distinguishable from the case before us. In *Moorman*, during the defendant's opening statement to the trial court, defense counsel promised to "prove that [the] defendant was physically and psychologically incapable of rape[.]" *Id.* at 393, 358 S.E.2d at 506. However, no such evidence was ever presented. *Id.* In addition, defense counsel in *Moorman* was found to have committed several other egregious acts during the course of the trial, such as failing to prepare for trial, appearing disheveled and rumpled, having mood swings, using and abusing multiple drugs, and falling asleep during the defendant's testimony. *Id.* at 394-96, 358 S.E.2d at 507-08. No such acts by counsel are alleged here.

In the present case, defense counsel conceded during defendant's opening statement that defendant was present at the laundromat during the killing, but argued that defendant only removed property

and took no part in the murder. Specifically, defense counsel stated that "the physical evidence in this case shows you that it was another man and not [defendant] who stabbed [the victim]." The physical evidence alluded to in this statement—evidence of a third person's blood found in the laundry, on the victim's truck, and behind an abandoned building—was introduced at trial. Thus, although Horton's testimony contradicted defendant's assertion that defendant did not murder the victim, defense counsel kept its "promise" to the jury that the physical evidence would point to another, unidentified person as the actual killer.

In addition, during defendant's opening statement, defense counsel stated that "there's going to be significant evidence that [defendant] told police that he never agreed with these other men to commit a robbery. You are not going to hear anything that says he planned or agreed to a killing, or that he had any idea that that would take place." Once again, the evidence introduced at trial corroborated defendant's opening statement. There was evidence introduced that defendant's statement to police did not indicate a plan to rob the victim and there was no evidence introduced that defendant had planned to kill the victim. However, defense counsel never stated there would be no evidence at all that defendant had not planned to rob the victim. Thus, Horton's information did not cause defense counsel to break counsel's "promise" to the jury.

Moreover, defendant was not convicted of first-degree murder on a theory of premeditation or deliberation. Rather, defendant was convicted under the felony murder rule. Although defendant told police that he and the other men had not planned the robbery, defendant also said they had talked about the robbery for three or four minutes before entering the laundromat. Defendant admitted stealing several items from the laundromat and defendant's palm print was found inside the laundromat. There was overwhelming evidence of defendant's guilt on a theory of felony murder.

Horton's statements concerning defendant, although materially adverse to defendant's case, did not cause "substantial and irreparable prejudice" to defendant's case. We conclude the trial court did not abuse its discretion in denying defendant's motion for mistrial, and we therefore overrule this assignment of error.

Defendant did not set forth arguments pertaining to his remaining assignments of error and we deem them abandoned pursuant to N.C.R. App. P. 28(b)(6).

No error.

Judges BRYANT and CALABRIA concur.