STATE OF NORTH CAROLINA v. SAMUEL KRIS HUNT, DEFENDANT

No. COA10-666

(Filed 3 May 2011)

**1. Sexual Offenses— second-degree—mentally disabled victim—evidence not sufficient**

The trial court erred by denying defendant's motion to dismiss a charge of second-degree sex offense where defendant contended that there was insufficient evidence that the victim was mentally disabled. The first element of mental disability under N.C.G.S. § 14-27.1(1) is "mental retardation;" however, there is a

wide range of abilities among those with such a diagnosis and the evidence must also show that the victim was substantially incapable of appraising the nature of his or her conduct, of resisting a sexual act, or of communicating unwillingness to submit to a sexual act. The State's evidence did not satisfy the latter requirement.

**2. Sexual Offenses— crime against nature—mentally disabled victim—evidence not sufficient**

The trial court erred by denying defendant's motion to dismiss the charge of crime against nature where the State's theory was that defendant committed the offense against a mentally disabled person who was incapable of consenting to any sexual acts. There was insufficient evidence that she was incapable of consenting.

Appeal by defendant from judgment entered on 8 October 2009 by Judge Edwin G. Wilson, Jr. in Superior Court, Randolph County. Heard in the Court of Appeals 26 October 2010.

*Attorney General Roy A. Cooper, III, by Assistant Attorney General Elizabeth J. Weese, for the State.*

*M. Alexander Charns, for defendant-appellant.*

STROUD, Judge.

Samuel Kris Hunt ("defendant") appeals from a trial court's order convicting him of second-degree sexual offense and a crime against nature. Because the State failed to present sufficient evidence of the victim's mental disability, we reverse and vacate defendant's convictions.

## I. Background

On 21 July 2008, defendant was indicted for second-degree sexual offense and a crime against nature. On 6 October 2009, defendant was tried on these charges during the Criminal Session of the Superior Court, Randolph County. The State's evidence tended to show that defendant lived with his wife and five children in Asheboro, North Carolina. On 25 May 2008, defendant's daughter Madison[1] had her sixteenth birthday party in the park, and her friend, Clara[2], age seventeen, attended the party. Clara and another girl decided to spend the night at defendant's house watching movies with Madison. Defendant and

1. We will refer to the defendant's minor daughter by the pseudonym Madison to protect her identity and for ease of the reading.

2. We will refer to the victim by the pseudonym Clara to protect her identity and for ease of reading.

his wife left the house around 9:00 p.m. and did not return until around 3:00 a.m. the next morning. Clara testified that when defendant returned, she was in the living room watching a movie with Madison and the other children in the house. Defendant first went to the bedroom but came back and sat down in the living room. Defendant then tapped Clara on the arm and motioned for her to follow him into the kitchen. Once in the kitchen, defendant began touching Clara on her breasts, vagina, and her "[b]utt." Defendant then "took his penis out[,]" and forced Clara's head down to his penis and she "[t]ried to pull away." Clara then put defendant's penis in her mouth and when she tried to raise her head, defendant pushed her head back down to his penis a second time and it went into her mouth again. Defendant then told her "Don't tell nobody. I can get in serious trouble." Defendant told Clara to go to his bedroom but instead she returned to the living room. Five minutes later Clara told the other girl spending the night with them what defendant had done. Later that morning, Clara told Madison that Madison's father had touched her and she had "sucked his dick." Clara left defendant's residence, returned home, and told her father what had happened. Her father took her to the police station to give a statement about what happened. Defendant was subsequently detained by police.

The State also presented evidence of Clara's mental disability. Clara testified that at the time of trial, she was in 12th grade, that she was getting A's and B's in school, planning to get a driver's license, and planning to attend the local community college after graduation. Clara testified that she had babysat for "a lot of people" in her neighborhood and paid her own bills. There was evidence presented that at the time of trial, she was living with her boyfriend and his mother.

Additionally, the State presented testimony from Asheboro Police Department Investigator Deborah McKenzie that she knew Clara from when she served as a school resource officer at Clara's middle school and she testified that Clara acted "child-like for her age group[.]" Lisa Cheek, a social worker with the Asheboro City School System, testified that she had known Clara for more than three years. Ms. Cheek testified that there were

> three levels at the school [for] children with exceptional disabilities, some with the higher levels, IQ levels, can be placed in the regular classrooms. Some who fall where they can't be in the regular classrooms and learn, go to the occupational skills course of study. And then those who cannot go out into the workforce or have really severe problems go into the functional skills class.

Ms. Cheek further testified that

> [a]s long as I've known [Clara], she's been in the occupational
> course of study level [the middle range], which is a class for spe-
> cial–for kids that have learning disabilities that kind of go at a
> slower pace. And . . . they go out into the workforce and they
> work hours and come back in. They have to have so many hours
> to graduate.

Ms. Cheek also testified that contrary to Clara's testimony, the
Randolph County Department of Social Services ("DSS") paid her
bills for her. Cheryl Lackey from the Randolph County DSS confirmed
that DSS did pay Clara's bills and she further testified that Clara had
a developmental disability and "her IQ is lower than 70." Heather
Cox, a special education teacher at Asheboro High School, testified
that Clara was "classified as intellectually disabled in the mild cate-
gory" and that "IQ-wise 100 is average" and Clara has an IQ of 61. Ms.
Cox also testified that Clara was in a

> modified curriculum. They still do English, math, social studies,
> science, but it's–it's more job skill oriented. They learn how to
> write a resume. They learn how to make change. They learn how
> to balance a checkbook, basic things. They're not headed to college;
> this group is not. So it's things that they will use in the workforce
> as well as, you know, in their life after they graduate.

Ms. Cox further testified that it would be "really difficult" but not
impossible for Clara to get an associate's degree from Randolph
Community College and she was in the top range of her level of
achievement at school in her classes. Following the State's presenta-
tion of evidence, defendant moved for dismissal based on insuffi-
ciency of the evidence and the trial court denied defendant's motion.

Defendant testified that on the night in question he had gone out
drinking with his wife and another couple. He testified that when he
returned home, he believed that Clara was interested in a sexual
encounter. Defendant admitted that Clara performed oral sex on him
but claimed that this contact was consensual. Defendant testified
that Clara had been to his house before to call boyfriends. He had
talked to Clara's father on about three occasions and her father said
that he was proud of Clara and she was a "straight A student." On 26
May 2008, the morning after the alleged incident with Clara, defend-
ant drove to the Asheboro police station and gave a statement admitting
that he engaged in fellatio with Clara in the kitchen of his home but

the encounter was consensual. Defendant denied knowing that Clara had any mental disability until the police informed him that she did. At the close of the presentation of all evidence, defendant again moved for dismissal based on insufficiency of the evidence, which was subsequently denied by the trial court.

On 8 October 2009, a jury found defendant guilty of second-degree sexual offense and a crime against nature. The trial court consolidated the two convictions and sentenced defendant to a term of 73 to 97 months imprisonment. Defendant gave notice of appeal in open court.

On appeal defendant contends that his judgments should be vacated and his convictions reversed because (1) the trial court erred by not granting defense counsel's motion for a mistrial after his conflict of interest became apparent, as he was accused of suborning perjury, coaching a child witness, and making false statements to the court; (2) the trial court erred by not granting defendant's motion to dismiss the charges based on the insufficiency of the evidence; and (3) he was provided ineffective assistance of counsel at trial. We find the issue of insufficiency of the evidence dispositive and thus we will address only this issue.

## II. Insufficiency of the evidence

[1] Defendant argues that there was insufficient evidence presented by the State to show that Clara was "mentally disabled" for the purposes of establishing second-degree sexual offense. Specifically, defendant argues that "there was no expert testimony that [Clara] was so substantially incapable of appraising the nature of her conduct or resisting any sexual act or communicating unwillingness to submit to any sexual act[,]" but, to the contrary, the State's evidence showed that she performed well in high school, babysat neighborhood children, planned to attend community college, was living with her boyfriend, and there was some indication that she was pregnant at the time of trial, but DSS had not raised any objection to her sexual relations with her boyfriend. The State, citing testimony from Clara's special education teacher, the police investigator, and the high school and DSS social workers, argues that "there was substantial evidence that [Clara] was mentally disabled."

## A. Standard of review

It is well established that

[t]he proper standard of review on a motion to dismiss based on insufficiency of the evidence is the substantial evidence test. The substantial evidence test requires a determination that there is substantial evidence (1) of each essential element of the offense charged, and (2) that defendant is the perpetrator of the offense. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. If there is substantial evidence of each element of the charged offense, the motion should be denied.

*State v. Martin*, 195 N.C. App. 43, 50, 671 S.E.2d 53, 59 (2009) (citation omitted). "In reviewing challenges to the sufficiency of evidence, we must view the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences. Contradictions and discrepancies do not warrant dismissal of the case but are for the jury to resolve." *State v. Fritsch*, 351 N.C. 373, 378-79, 526 S.E.2d 451, 455 (citations, and quotation marks omitted), *cert. denied*, 531 U.S. 890, 148 L. Ed. 2d 150 (2000).

B. Second-degree sexual offense

Defendant was charged with second-degree sexual offense. N.C. Gen. Stat. § 14-27.5 (2007), in pertinent part, states that

(a) A person is guilty of a ual offense in the second degree if the person engages in a sexual act with another person:

(1) By force and against the will of the other person; or

(2) Who is mentally disabled, mentally incapacitated, or physically helpless, and the person performing the act knows or should reasonably know that the other person is mentally disabled, mentally incapacitated, or physically helpless.

*See State v. Williams*, — N.C. App. —, —, 698 S.E.2d 542, 544 (2010) ("To support the charge of second-degree sexual offense, the State was required to present substantial evidence that the defendant (1) engaged in a sexual act; (2) with a person who is mentally disabled, mentally incapacitated, or physically helpless; and (3) knew or should reasonably have known that the other person is mentally disabled, mentally incapacitated, or physically helpless.") "One who is mentally disabled under the sex offense laws is statutorily deemed incapable of consenting to intercourse or other sexual acts." *Williams*, — N.C. App. at —, 698 S.E.2d at 544. (citation, brackets, and quotation marks omitted). N.C. Gen. Stat. § 14-27.5(a)(1) is not

applicable to the facts before us, as the trial court did not instruct the jury on the use of force. Additionally, there was no evidence presented showing that Clara was "mentally incapacitated, or physically helpless[.]" Therefore, those portions of N.C. Gen. Stat. § 14-27.5 are not relevant to our analysis.

The trial court did give the jury the following instruction as to "mental disability[:]"

> Second, that the victim was mentally disabled. A person is mentally disabled if she suffers from a mental retardation or mental disorder and this mental retardation or mental disorder temporarily or permanently renders her substantially incapable of appraising the nature of her conduct, or resisting a sexual act or communicating unwillingness to submit to a sexual act.

According to N.C. Gen. Stat. § 14-27.1(1) (2007), "mentally disabled" means:

> (i) a victim who suffers from mental retardation, or (ii) a victim who suffers from a mental disorder, either of which temporarily or permanently renders the victim substantially incapable of appraising the nature of his or her conduct, or of resisting . . . a sexual act, or of communicating unwillingness to submit to . . . a sexual act.

The State did not contend that Clara had a "mental disorder" which "temporarily or permanently renders the victim substantially incapable of appraising the nature of his or her conduct, or of resisting . . . a sexual act, or of communicating unwillingness to submit to . . . a sexual act." *See id.* Therefore, the dispositive issue before us is whether the evidence presented by the State was sufficient to show that Clara suffered from (1) mental retardation; (2) which "temporarily or permanently render[ed] [her] . . . substantially incapable of appraising the nature of . . . her conduct, or of resisting . . . a sexual act, or of communicating unwillingness to submit to . . . a sexual act." *See id.* We hold that the State's evidence was not sufficient to satisfy this element of the crime of second-degree sexual offense.

1. Mental retardation

The first element of "mental disability" under N.C. Gen. Stat. § 14-27.1(1) is "mental retardation." The phrase "mental retardation" is not further defined in Article 7A of our General Statutes; therefore, we must assume that the legislature intended its ordinary meaning to apply. *See 1 Lafayette Transp. Serv., Inc. v. Robeson Cty.*, 283 N.C. 494, 500,

196 S.E.2d 770, 774 (1973) ("Unless the contrary appears, it is presumed that the Legislature intended the words of the statute to be given the meaning which they had in ordinary speech at the time the statute was enacted."). The ordinary meaning of "mental retardation" is

> subaverage intellectual ability equivalent to or less than an IQ of 70 that is accompanied by significant deficits in abilities (as in communication or self-care) necessary for independent daily functioning, is present from birth or infancy, and is manifested esp. by delayed or abnormal development, by learning difficulties, and by problems in social adjustment.

Merriam-Webster's Collegiate Dictionary 775 (11th ed. 2005). Courts have considered the definition of mental retardation in many contexts, both criminal and civil. The United States Supreme Court in *Atkins v. Virginia*, 536 U.S. 304, 153 L. Ed. 2d 335 (2002), which held that capital punishment of mentally retarded defendants is a cruel and unusual punishment prohibited by the 8th Amendment of the United States Constitution, discussed this definitional problem, noting that:

> The American Association on Mental Retardation (AAMR) defines mental retardation as follows: "*Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18." Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed. 1992).

> The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.

2000). "Mild" mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. *Id.*, at 42-43.

*Id.* at 308 n.3, 153 L. Ed. 2d at 342 n.3. The United States Supreme Court recognized that the determination of mental retardation is essentially a medical diagnosis which is based upon a combination of factors.

> [C]linical definitions of mental retardation require not only sub-average intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18. Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. . . . [T]here is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders.

*Id.* at 318, 153 L. Ed 2d at 348 (footnotes omitted). For the purpose of sentencing in a capital punishment case, our legislature has defined "mentally retarded" as "[s]ignificantly subaverage general intellectual functioning, existing concurrently with significant limitations in adaptive functioning, both of which were manifested before the age of 18." N.C. Gen. Stat. § 15A-2005(a)(1)(a) (2007).

All of the definitions of "mental retardation" noted in the statutes and caselaw above are generally consistent with the dictionary definition. All of the definitions include three elements: (1) subaverage intellectual ability; (2) significant deficits in abilities needed for independent daily functioning; and (3) the condition was present from a young age. The State presented evidence that Clara had a low I.Q., below 70, or 61, which would be in the range of mental retardation. The State also presented evidence that Clara had some deficits in abilities needed for daily living, although whether they were substantial or significant deficits may be debatable. In addition, her condition was present from a young age. But even if the evidence was sufficient to establish "mental retardation[,]" N.C. Gen. Stat. § 14-27.1(1) requires not just a diagnosis of mental retardation, but also evidence that the mental retardation is of such a degree that it "temporarily or permanently renders the victim substantially incapable of appraising

the nature of his or her conduct, or of resisting . . . a sexual act, or of communicating unwillingness to submit to . . . a sexual act." N.C. Gen. Stat. § 14-27.1(1) thus recognizes that there is a wide range of abilities among those who have a diagnosis of mental retardation. Some are able to function well in society and live independently or with minimal assistance, while others cannot.

## 2. Renders victim substantially incapable of resistance

The second element of the definition of "mental disability" addresses the victim's ability to resist a sexual advance. Even if the State's evidence satisfied the ordinary definition of "mental retardation," it did not demonstrate that Clara was "substantially incapable of appraising the nature of . . . her conduct, or of resisting . . . a sexual act, or of communicating unwillingness to submit to . . . a sexual act[,]" as stated in N.C. Gen. Stat. § 14-27.1(1). The State presented the following evidence regarding Clara's mental capacity: Clara was in the top range of her level of achievement at high school in her classes, making A's and B's; she babysat neighborhood children; she planned to get her driver's license and to attend community college after graduation; at the time of trial, she was living with her boyfriend and his mother; and there was some indication that she was pregnant but there had been no DSS intervention or charges filed against the boyfriend.[3] Clara was also described as "childlike"; she attended classes for children with learning disabilities; she was classified as intellectually disabled in the mild category, with an I.Q. of 61; DSS paid her bills for her; and it would be difficult for her to get an associate's degree from the local community college.

In *State v. Williams*, —— N.C. App. ——, 698 S.E.2d 542 (2010), and *State v. Washington*, 131 N.C. App. 156, 506 S.E.2d 283 (1998), this Court addressed the issue of whether there was sufficient evidence to establish the victim's mental disability. In *Williams*, the defendant was convicted on one count of second-degree sexual offense and one count of a crime against nature. *Id.* at ——, 698 S.E.2d at 544. On appeal, the defendant contended that the trial court erred as "there was insufficient evidence that [the victim] was mentally disabled pursuant to North Carolina General Statutes, section 14-27.1(1)."

---

3. Were we to accept the State's argument that Clara's diagnosis of mental retardation along with the evidence of her capabilities as presented at trial are sufficient to show that she is unable to consent to a sexual act under N.C. Gen. Stat. § 14-27.1(1), Clara would be legally incapable of ever consenting to sexual acts with anyone, including her boyfriend, and he—or even her future husband, should she ever marry—would be subject to criminal liability for any sexual activity with Clara.

*Id.* Specifically, the defendant argued that there was insufficient evidence to show that the victim was substantially incapable of resisting a sexual act, pursuant to N.C. Gen. Stat. § 14-27.1(1). *Id.* at ——, 698 S.E.2d at 545. Citing *State v. Oliver*, 85 N.C. App. 1, 20, 354 S.E.2d 527, 538 (1987), this Court noted that

> the element of "substantially incapable of . . . resisting the . . . sexual act" is not negated by the victim's ability to verbally protest or even to engage in some physical resistance of the abuse. The words "substantially incapable" show the Legislature's intent to include within the definition of "mentally [disabled]" those persons who by reason of their mental retardation or disorder would give little or no physical resistance to a sexual act.

*Id.* The trial court noted that expert testimony showed that the victim

> had a full scale I.Q. of fifty-eight, placing him in the range of mild mental retardation[;] . . . had difficulty expressing himself verbally; was able to read very simple words like go, cat, and in; was able to solve very simple addition and subtraction problems; and had difficulty answering questions about social abilities, every-day-life tasks.

*Id.* (quotation marks and brackets omitted). The victim's sister testified that the victim "needed daily assistance with cooking, washing his clothes, and making sure he brushed his teeth." *Id.* (quotation marks and brackets omitted). The victim testified that he did not want the defendant to perform oral sex on him and also told police that "he did not want the incident to take place." *Id.* This Court concluded that notwithstanding the victim's unwillingness to receive oral sex, "defendant completed the sexual act, allowing an inference that [the victim] was unable to resist the sexual act." *Id.* This Court then held that "[w]hen taken in the light most favorable to the State, a reasonable juror could find that [the victim] was substantially incapable of resisting a sexual act and was 'mentally disabled' pursuant to North Carolina General Statutes, section 14-27.1(1)." *Id.* at ——, 698 S.E.2d at 546.

Likewise in *Washington*, the defendant was indicted on two counts of second-degree rape[4] and two counts of second-degree sexual

4. A person can be found guilty of second-degree rape pursuant to N.C. Gen. Stat. § 14-27.3 (2007) "if the person engages in vaginal intercourse with another person: . . . . Who is *mentally disabled*, mentally incapacitated, or physically helpless, and the person performing the act knows or should reasonably know the other person is mentally disabled, mentally incapacitated, or physically helpless." (Emphasis added).

offense. *Id.* at 159, 506 S.E.2d at 285. At trial, the State presented expert witness testimony from Dr. Monty Grubb, as an expert "in the field of psychology, specifically in the field of working with, counseling, and treating mentally retarded people." *Id.* at 164, 506 S.E.2d at 288. For over a year, Dr. Grubb had met with the victim "once a month for counseling sessions lasting twenty to thirty minutes." *Id.* at 164, 506 S.E.2d at 289. Dr. Grubb testified

> that [the victim] was mentally retarded. Based on his experiences and on his review of psychological evaluations performed on [the victim], Dr. Grubb testified that [the victim] functions around the level of an eight-year-old, both mentally and emotionally. He testified that [the victim's] ability to make informed decisions about "anything complicated" is significantly decreased by her mental retardation. In Dr. Grubb's words, "She can't evaluate a lot of different things and put it together and make a decision in her own best interest most of the time. Weighing all the consequences and all the information is something that she is not very capable of doing."

*Id.* at 164-65, 506 S.E.2d at 289. In response to the State's question as to how the victim "would react to a sexual advance made by an adult with whom she was only vaguely familiar[,]" Dr. Grubb answered that the victim "might 'freeze,' because her 'initial reaction could be so emotionally laden, not realizing what was happening, . . . given the emotional nature of the situation[,]' " and, consequently, she "might easily be taken advantage of by a stranger." *Id.* at 165, 506 S.E.2d at 289. On appeal from his conviction on all charges, the defendant contended that "the trial court erred by denying his motion to dismiss all charges." *Id.* at 166, 506 S.E.2d at 290. This Court noted that

> if there is substantial evidence that a person has engaged in prohibited sexual conduct in violation of G.S. 14-27.3 or 14-27.5, and that the victim was mentally defective, and that the person performing the act knew or reasonably should have known that the victim was mentally defective, then *ipso facto*, there is substantial evidence that the person has engaged in such conduct "by force and against the will" of the victim.

*Id.* at 167, 506 S.E.2d at 290. In affirming the denial of the defendant's motion to dismiss, this Court held that

> there was substantial evidence that defendant engaged in both vaginal intercourse and a "sexual act" with [the victim;] . . . . that [the victim] was mentally retarded, and that defendant knew of

[the victim's] retardation[;] . . . . [and] that [the victim's] mental retardation rendered her substantially incapable of "resisting the act of vaginal intercourse or a sexual act."

*Id.*

We first note that the Court in *Williams* inferred from the victim's actions that he "was unable to resist the sexual act[,]" as required by N.C. Gen. Stat. § 14-27.1(1) because the victim testified that he did not want the sexual act performed but ultimately allowed the defendant to perform the sexual act. ―― N.C. App. at ――, 698 S.E.2d at 545. Yet this inference was based in part on the expert's testimony that the victim "had difficulty expressing himself verbally; was able to read very simple words like go, cat, and in; was able to solve very simple addition and subtraction problems; and had difficulty answering questions about social abilities, every-day-life tasks." *Id.* Here, defendant forced Clara's head down to his penis and she "[t]ried to pull away[,]" indicating that she did not want to perform the sexual act but ultimately did perform oral sex on defendant. There was no evidence that Clara had difficulty with communication; she also promptly reported defendant's acts to her friend, Madison, her father and the police on the day of the incident and testified at trial clearly, with little if any indication that she had difficulty understanding or answering questions from counsel. We cannot draw an inference regarding Clara's inability to resist a sexual advance, as did the court in *Williams*, as there was no expert testimony regarding the effect of her mental retardation upon her ability to communicate resistance to sexual advances. The evidence here demonstrates that Clara was functioning at a much higher level that the victim in *Williams*, as she was performing well in school and social situations. The expert witnesses in *Williams* and *Washington* testified about the nature and extent of each victim's mental retardation, noting the victim's communication and reading skills, social abilities, mental and emotional age, cognitive limitations, decision-making skills, and responses to sexual advances by adults. This expert testimony was based on their professional knowledge, psychological evaluations performed on the victims, and from observations made during counseling sessions. Here, unlike *Williams* or *Washington*, all of the State's witnesses were lay witnesses and none were qualified as experts in evaluating or treating persons with mental disabilities.[5] N.C. Gen. Stat. § 8C-1,

_____

5. Although we recognize that a teacher or a social worker may have specialized training which could permit her to testify as an expert witness, no witness in this case was proffered as an expert or presented testimony as an expert witness.

Rule 701 (2007) limits lay witnesses' testimony to "the form of opinions or inferences . . . to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." It is possible that in some cases a lay witness may have sufficient knowledge and understanding of the victim or the victim's disability may be so severe and obvious that "rationally based on [his] perception[s][,]" *see id,* he could provide evidence to support a finding that the victim's mental retardation or mental disorder was such that the victim was "substantially incapable of appraising the nature of his or her conduct, or of resisting . . . a sexual act, or of communicating unwillingness to submit to . . . a sexual act." *See* N.C. Gen. Stat. § 14-27.1(1). In this case, the witnesses did not, and as lay witnesses could not, give an opinion that Clara, who has mild mental retardation but is also functional enough to perform well in school and communicate well with others is "[m]entally disabled" as defined by N.C. Gen. Stat. § 14-27.1(1), based only on their perceptions. N.C. Gen. Stat. § 8C-1, Rule 702(a) (2007) states that "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion." As illustrated by *Williams* and *Washington,* an expert witness qualified to evaluate the victim's mental retardation and ability to function was necessary in this situation to provide the "scientific, technical or other specialized knowledge[,]" *see id.,* to assist the jurors in understanding the extent of Clara's mental retardation and to discern whether she was "substantially incapable of appraising the nature of . . . her conduct, or of resisting . . . a sexual act, or of communicating unwillingness to submit to . . . a sexual act." *See* N.C. Gen. Stat. § 14-27.1(1).

We note that in cases where a defendant who is charged with a crime claims to be mentally retarded, our Courts have frequently relied on expert opinions to determine the existence and extent of a defendant's mental retardation. *See State v. Ortez,* 178 N.C. App. 236, 247-48, 631 S.E.2d 188, 196-97 (2006) (the Court considered contrasting expert witness testimony regarding the extent of the defendant's mental retardation in determining whether defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights), *appeal dismissed and disc. review denied,* 361 N.C. 434, 649 S.E.2d 642 (2007); *State v. Nicholson,* 355 N.C. 1, 56, 558 S.E.2d 109, 145-46 (2002) (holding no error in the trial court not giving a peremptory instruction on

the mitigating factor—"The age of the defendant at the time of the crime"—for purposes of capital punishment sentencing pursuant to N.C. Gen. Stat. § 15A-2000(f)(7) because the defendant's "mental age was by no means established by a consensus of experts" as the defendants' experts testified that the 32 year old defendant's mental age was between 12 1/2 and 13 years of age and between "mild mental retardation and borderline IQ" but other expert witnesses testified that "his social skills were described as 'pretty good' and as 'his biggest strength.' "); *State v. Zuniga*, 348 N.C. 214, 217-18, 498 S.E.2d 611, 613 (1998) (because expert witness testimony established that the defendant had "a history of mild to moderate mental retardation and organic brain syndrome of moderate range[;]" and an IQ of 56 or 64, indicating a mental age of 7.4 years; and had very low impulse control, it was prejudicial error for the trial court not to submit the N.C. Gen. Stat. § 15A-2000(f)(7) mitigating circumstance regarding the defendant's age at the time of the crime to the jury). In addition, the expert evaluation of mental retardation normally requires specialized testing, including IQ tests and other psychological tests, as well as observation of the person who is being evaluated, to determine the existence and degree of mental retardation.

Likewise in civil cases, our Courts have relied on expert opinions to determine the existence and extent of a party's mental retardation. *See In re LaRue*, 113 N.C. App. 807, 811-12, 440 S.E.2d 301, 303-04 (1994) (the trial court erred in terminating the parental rights of the parents as the expert witness testimony that they had "IQ scores of 71 and 72[,]" were "borderline" mentally retarded, and did not exhibit "significant defects in adaptive behavior" did not support a conclusion "that they are mentally retarded within the meaning of N.C. Gen. Stat. § 7A-289.32(7)"); *Gilliam v. Perdue Farms*, 112 N.C. App. 535, 537, 435 S.E.2d 780, 781 (1993) (the trial court in holding that there was competent evidence to support the Industrial Commission's conclusion that the claimant was disabled relied in part on expert testimony that the claimant's "functional capacity assessment" revealed that he was "cognitively dysfunctional and appear[ed] to be mentally retarded"); *Suggs v. Snow Hill Milling Co.*, 100 N.C. App. 527, 530-31, 397 S.E.2d 240, 241-42 (1990) (this Court relied in part on expert testimony that the plaintiff "had [a] considerable mental handicap" in determining that competent evidence supported the Industrial Commission's findings).

In this case, the necessity for expert testimony is highlighted by defendant's claim that he did not know and reasonably would not

know from his observations of Clara that she was mentally disabled, as his knowledge of her disability is also an element of second-degree sexual offense under N.C. Gen. Stat. § 14-27.5. Defendant claimed, and Clara's own testimony confirmed, that he knew Clara as one of his daughter's friends who attended school, was a good student, and appeared to function as a normal 17 year old girl.

Accordingly, we hold that in situations such as presented by this case, where the victim's IQ falls within the range considered to be "mental retardation[,]" but who is highly functional in her daily activities and communication, the State must present expert testimony as to the extent of the victim's mental disability as defined by N.C. Gen. Stat. § 14-27.5. Here no expert witness testified as to the extent of Clara's mental disability. Even when viewed in the light most favorable to the State, *see Fritsch*, 351 N.C. at 378, 526 S.E.2d at 455, the State's lay witness testimony was insufficient to establish that Clara's mental retardation "temporarily or permanently render[ed] [her] . . . substantially incapable of appraising the nature of . . . her conduct, or of resisting . . . a sexual act, or of communicating unwillingness to submit to . . . a sexual act." *See* N.C. Gen. Stat. § 14-27.1(1). Thus, we hold there was insufficient evidence to satisfy this required element of second-degree sex offense. *See* N.C. Gen. Stat. § 14-27.5. Therefore, the trial court erred in not granting defendant's motion to dismiss for insufficient evidence as to this charged offense.

C. Crime against Nature

[2] Defendant, citing *State v. Whiteley*, 172 N.C. App. 772, 616 S.E.2d 576 (2005), argues that since there was insufficient evidence of second-degree sexual offense, there was also insufficient evidence of the crime against nature, so the trial court erred in denying his motion to dismiss on that charge. The State counters that the trial court properly denied defendant's motion to dismiss for insufficiency of the evidence as to the crime against nature charge, as this charge "was based on non-consensual sexual acts[.]"

N.C. Gen. Stat. § 14-177 (2007) states that "[i]f any person shall commit the crime against nature, with mankind or beast, he shall be punished as a Class I felon." "[T]he legislative intent and purpose of G.S. 14-177 . . . is to punish persons who undertake by unnatural and indecent methods to gratify a perverted and depraved sexual instinct which is an offense against public decency and morality." *State v. Stubbs*, 266 N.C. 295, 298, 145 S.E.2d 899, 902 (1966). The act of fellatio is considered a crime against nature. *State v. Poe*, 40 N.C. App.

385, 387-88, 252 S.E.2d 843, 844-45, *cert. denied and appeal dismissed*, 298 N.C. 303, 259 S.E.2d 304 (1979), *appeal dismissed*, 445 U.S. 947, 63 L. Ed. 2d 782 (1980).

In *Whiteley*, the defendant challenged the constitutionality of N.C. Gen. Stat. § 14-177 in light of the United States Supreme Court's holding in *Lawrence v. Texas*, 539 U.S. 558, 156 L. Ed. 2d 508 (2003). 172 N.C. App. at 773, 616 S.E.2d at 577-78. The Court in *Whiteley* noted that in *Lawrence* the Court held that a Texas law "prohibiting 'deviate sexual intercourse' with a member of the same sex violated the due process clause, where the individuals charged were adults engaging in consensual, private sexual activity[,]" and that the holding in *Lawrence* was "based on the unconstitutional infringement of the liberty interest in private, intimate acts between consenting adults." 172 N.C. App. at 776, 616 S.E.2d at 579 (citing *Lawrence*, 539 U.S. at 574-75, 578, 156 L. Ed. 2d at 523, 525). The Court in *Whiteley* also noted that the "liberty interest in personal relations" in *Lawrence* did have limitations as the opinion "clearly indicates that state regulation of sexual conduct involving minors, non-consensual or coercive conduct, public conduct, and prostitution falls outside the boundaries of the liberty interest protecting personal relations and is therefore constitutionally permissible." *Id.* at 776-77, 616 S.E.2d at 579-80. In holding that N.C. Gen. Stat. § 14-177 was constitutional on its face, in light of the holding in *Lawrence*, the Court held "that section 14-177 may properly be used to prosecute conduct in which a minor is involved, conduct involving non-consensual or coercive sexual acts, conduct occurring in a public place, or conduct involving prostitution or solicitation[.]" *Id.* at 779, 616 S.E.2d at 581. In addressing the defendant's argument as to the application of N.C. Gen. Stat. § 14-177 to the facts before them, the Court held that "in order for the application of section 14-177 to be constitutional post-*Lawrence* . . . the State must prove beyond a reasonable doubt that defendant committed the sexual act, . . . and that such an act was non-consensual." *Id.* at 779, 616 S.E.2d at 581. In applying this rule, the Court held that the trial court had erred in its instructions to the jury "[a]s the jury was not instructed to consider whether the act was committed without [the victim's] consent[.]" *Id.* at 780, 616 S.E.2d at 581.

The State alleged that defendant committed the crime of second-degree sexual offense because he engaged in a sexual act with Clara, a mentally disabled person who was incapable of consenting to any sexual acts. *See Williams*, —— N.C. App. at ——, 698 S.E.2d at 544. Thus, the State's proof of the lack of consent is based solely upon

Clara's inability to consent because of her mental disability. Yet we held above that the State presented insufficient evidence to meet N.C. Gen. Stat. § 14-27.1(1)'s definition of "mentally disabled." Just as there was insufficient evidence to show that Clara was incapable of consenting for purposes of proving the charged crime of second-degree sexual offense, there was also insufficient evidence to prove that Clara was incapable of consenting for purposes of a N.C. Gen. Stat. § 14-177 crime against nature charge, under the standard established by *Whiteley*. Thus, the State did not present sufficient evidence to "prove beyond a reasonable doubt that defendant committed the sexual act, . . . and that such an act was non-consensual." *Whiteley*, 172 N.C. at 779, 616 S.E.2d at 581. Accordingly, the trial court erred in denying defendant's motion to dismiss as to the crime against nature charge. As there was insufficient evidence of both of the charges against defendant and the trial court erred in not granting defendant's motion to dismiss, we reverse and vacate defendant's convictions for second-degree sexual offense and the crime against nature.

VACATED.

Chief Judge MARTIN and Judge STEPHENS concur.